[L. A. No. 2558.   Department One.—July 15, 1910.]

REBECCA A. FOSS, Respondent, v. JOHN JOHNSTONE, Jr., Appellant, and HORTENSE A. HALE, Respondent.

APPEAL FROM JUDGMENT—PRESUMPTION AS TO DATE OF ENTRY.—Where the record shows that the judgment was rendered six days before the judgment-roll was made up, but does not show the exact date of its entry, the presumption is that it was entered before the judgment-roll was made up; and an appeal from the judgment taken within less than six months from such presumed entry is in time under section 939 of the Code of Civil Procedure.

ID.—ABSENCE OF NOTICE OF ENTRY—REVIEW OF EVIDENCE.—If no notice of the entry of the judgment was served upon the attorney for the appellant, as provided in section 941b, within sixty days before the taking of the appeal, then under sections 941b and 941c the sufficiency of the evidence may be reviewed upon appeal from the judgment.

ID.—APPEAL FROM ORDER DENYING NEW TRIAL—MISTAKE IN DATE.—A mistake in the notice of appeal from the order denying a new trial, as to the date of the order appealed from, does not invalidate the appeal, where the description of the order referred to is reasonably sufficient to identify it.

Id.—Time for Appeal from Order—Absence of Notice of Entry.—
Although the filing of the notice of appeal more than sixty days
after the true date of the rendition of the order, would be too late
if the provisions of subdivision 3 of section 939 were the only statute
applicable to the case; yet section 941b allows an appeal to be
taken therefrom at any time after the rendition thereof, provided
it is within sixty days after notice of the entry thereof has been
served on the attorney of record of the adverse party, or if no such
notice is given, then not later than six months after such entry.

Id.—Notice of Entry not Required to be Made of Record—Burden
of Proof upon Respondent.—Section 941b does not require that
any notice of the entry of the order shall be filed or put upon the
record, and in the absence of notice the statute fixes the arbitrary
limit of six months from the entry. In these circumstances, the
burden is upon the respondent to show service of the required notice
of entry of the order appealed from, and the date of such service,
and to establish lack of jurisdiction of the appeal.

Id.—Power of Respondent to Protect Himself.—The respondent can
always protect himself from an unauthorized or invalid appeal by
putting the proof of service of the notice of the entry of the order
appealed from on file in the court below, and bring it to the atten-
tion of the appellate court.

Id.—United States Patents to Land Meandering on Unnavigable
Pond—Local Law.—It is the settled rule of the decisions of the
supreme court of the United States, that the incidents or rights
attaching to the ownership of lands conveyed by the government,
meandering on an unnavigable pond, are to be determined by the
law of the state.

Id.—Code Law of California.—Under section 830 of the Civil Code,
except where the grant under which the land is held indicates a dif-
ferent intent, the owner of the upland, when it borders upon any
other than navigable water, takes to the middle thereof; and the
owner of land patented by the United States bordering upon a
non-navigable pond takes by the law of this state to the center of
the pond.

Id.—Reference in Patents to Official Plat and Survey—Part De-
scription of Land Granted.—The reference in the patents from
the United States to the official plat and survey makes the plat and
the field-notes of the survey a part of the description of the land
granted, as fully as if they were incorporated at length in the
patents.

Id.—Practice of Government in Describing Land Bordering on
Waters.—It has been the uniform practice of the government of the
United States from its origin, in disposing of the public lands, to
measure the price to be paid for land by the quantity of the upland
granted and to make no charge for the lands under the bed of
any body of water. The meander lines run along or near the mar-
gin of such waters are run for the purpose of ascertaining the exact

quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines, the waters themselves constituting the real boundary, and extending to the center thereof, when the law of the state so permits.

ID.—LANDS COVERED BY PERMANENT NON-NAVIGABLE LAKE OR POND, NOT SWAMP AND OVERFLOWED—PROPERTY OF UNITED STATES.—Lands covered by a permanent non-navigable lake or pond situated on government land is the property of the United States, and does not come within the terms of the grant of swamp and overflowed land by the United States to the state. .

ID.—GRANT OF "SWAMP AND OVERFLOWED LANDS" IN PRÆSENTI.—The Swamp Land Act of September 28, 1850, was in effect a present grant of all the "swamp and overflowed lands" then belonging to the United States, situated within the limits of the state, and the title of the state thereto does not depend on the actual issuance to the state of the patent therefor as directed by the act.

ID.—OFFICE OF PATENT—IDENTIFICATION OF LANDS NECESSARY.—The office of the United States patent is to make the description of the lands definite and conclusive as between the United States and the state. Identification of the lands is necessary in order to determine whether or not any particular tract comes within the general description of "swamp and overflowed lands."

ID.—ACT OF 1866 TO FACILITATE IDENTIFICATION.—The act of Congress of July 23, 1866, was passed to facilitate identification of swamp and overflowed lands. It describes four methods of identification: 1. A certificate from the commissioner of the land-office to the state of all lands represented as such on the approved plat; 2. "Segregation maps and surveys" made by the state to conform to the government surveys, to be approved by the commissioner of the land-office; 3. When not so conforming, the surveyor-general of the United States was to make segregation maps according to the best evidence he could obtain, showing what was swamp and overflowed land; 4. If the state should claim other land as swamp and overflowed, the character of the land was to be decided by the surveyor-general, subject to the approval of the general land-office.

ID.—"SEGREGATION MAPS"—STATE MAPS FORWARDED—EFFECT OF SUBSEQUENT SURVEYS BY COUNTY SURVEYORS.—The "segregation maps" to be examined by the second plan of identification are the state maps forwarded to the United States, under the state act of May 13, 1861. Subsequent surveys by county surveyors, under the direction of the state surveyor-general, after the passage of the act of 1866, were mere private surveys of no official force, and are not referred to by the act of 1866.

ID.—LAND UNCOVERED BY RECESSION OF NON-NAVIGABLE LAKES AND PONDS NOT GRANTED TO STATE.—The United States has not granted to the state lands uncovered by the recession or the drainage of inland lakes and ponds which are non-navigable, and which belong under the laws of the state to the owners of the abutting upland.

ID.—VOID STATE PATENT.—A state patent of such land to the appellant
in 1905 as land uncovered by the recession of inland lakes under the
California statute of 1893, is void and passed no title to him,
where such patent is not included in any of the methods of identifi-
cation fixed by the act of 1866.

ID.—SCHEME PROVIDED BY ACT OF 1866 EXCLUSIVE.—The scheme pro-
vided by the act of Congress of July 23, 1860 for the identification
of "swamp and overflowed lands," superseded all previous rules and
methods for that purpose, and is exclusive.

ID.—DECISION OF SURVEYOR-GENERAL CONCLUSIVE COLLATERALLY.—The
pond having been represented on the official township plats approved
in 1870 and 1881, respectively, as land belonging to the United
States and so acquiesced in by the state authorities until 1906, the
decision of the surveyor-general was a decision as to the character
and title to the land, which was intrusted to him to decide, and
when nothing was done under the former method of identification to
show otherwise, his decision is conclusive as against a collateral
attack.

APPEAL from a judgment of the Superior Court of San
Diego County and from an order denying a new trial. T. L.
Lewis, Judge.

The facts are stated in the opinion of the court.

John Johnstone, Jr., E. Swift Torrance, J. B. Mannix,
Stearns & Sweet, and E. S. Torrance, for Appellant.

E. E. Keech, for Plaintiff, Respondent.

SHAW, J.—This is an appeal by Johnstone from the judg-
ment and from an order denying his motion for a new trial.

The plaintiff makes a preliminary objection to the jurisdic-
tion of the appeal, on the ground that the notice of appeal
was filed after the time limited for such appeals had expired.
The notice of appeal was filed on September 29, 1909. It
purports to appeal both from the judgment and from the
order. The judgment was rendered on April 2, 1909. The
record does not show the exact date of its entry, but the pre-
sumption is that it was entered before the judgment-roll was
made up, which was on April 8, 1909. The order denying
the new trial was made and entered on July 30, 1909.

The appeal from the judgment was taken within six months
after the entry thereof. Hence it was in time under section

939 of the Code of Civil Procedure. If no notice of the entry of the judgment was served on the attorney for the appellant, as provided in section 941b, within sixty days before the taking of the appeal, then, under sections 941b and 941c, the sufficiency of the evidence may be considered on that appeal. But as we have concluded that this may be done on the appeal from the order, it is not material in this case whether it can be done on the other appeal or not.

With respect to the order, the notice of appeal states that Johnstone appeals "from the order made and entered in the minutes of said court on the 7th day of April, 1909, denying the motion of the said defendant, John Johnstone, Jr., for a new trial of said action." The order was not made on that date, but was made on July 30, 1909. It is settled that a mistake in the notice of appeal as to the date of the order or judgment appealed from does not invalidate the appeal, where there is a description of the order or judgment referred to, in other parts of the notice, reasonably sufficient to identify it. (*Weyl* v. *Sonoma etc. Co.*, 69 Cal. 202, [10 Pac. 510] ; *Anderson* v. *Goff*, 72 Cal. 65, [1 Am. St. Rep. 34, 13 Pac. 73] ; *Swasey* v. *Adair*, 83 Cal. 136, [23 Pac. 284].)

The filing of the notice of appeal on September 29, 1909, sixty-one days after the thirtieth day of July, the true date of the rendition and entry of the order, would make it too late if the provisions of subdivision 3 of section 939 were the only statute applicable to the case. But section 941b allows an appeal to be taken from a judgment, order, or decree, at any time after the rendition thereof, provided it is within sixty days after notice of the *entry* thereof has been served on the attorney of record of the adverse party, or, if no such notice is given, then not later than six months after such entry. The appeal from the order would therefore be valid, unless notice of the entry of the order was served on July 30th. The record does not show that any notice of such entry was ever given or served. The plaintiff has not moved to dismiss the appeal, nor filed any affidavits or other evidence that such notice of entry was served. He raises the point solely by the objection that the record, upon its face, does not show that this court has jurisdiction of the appeal. The statute, 941b, does not direct that the notice of the entry of the judgment or order shall be filed or put on record. In

the orderly course of procedure it should be filed, even if the statute does not direct it. The sole purpose of the notice is to mark the beginning of the period limited for taking an appeal. When such notice is given the appellant could make the transcript show jurisdiction by inserting a copy of it with the admission of service, and of the certificate of filing, if it is on file. But if none is given and the appeal is taken more than sixty days after the entry, the appellant can make no showing of record on the subject, and can prove that his appeal is timely only by filing with the transcript an affidavit that no notice of entry has been served. In the absence of notice the statute fixes the arbitrary limit of six months from the time of the entry. Jurisdiction of such appeals, taken prior to that time and after sixty days from the entry must therefore depend upon matters not required to be of record. In these circumstances, it seems that the better rule is to require the respondent, if he desires to raise the question, to support his claim by affidavit or other evidence, showing service of the required notice of entry of the order appealed from, and the date of such service.

We think the case may be distinguished from the *Estate of More,* 143 Cal. 495, [77 Pac. 407]. That was an appeal taken before the enactment of section 941b. The transcript on appeal failed to show that the judgment had been entered, and as, under the construction uniformly given to section 939 of the Code of Civil Procedure, an appeal before such entry was premature, and there was no other evidence before the court on the subject, it was held that there was a failure to show jurisdiction and a motion to dismiss the appeal on that ground was granted. The entry of a judgment is a matter of record. It is, indeed, the act which makes the judgment a record. If the transcript purports to be complete and does not show the entry of the judgment upon record in the judgment-book as the law directs, there would be some sort of presumption that it had not been entered. It would be incumbent on the appellant in such a case to explain the omission or supply it if, in point of fact, the judgment had been entered. The present case is almost the opposite of that, so far as the legal presumptions and intendments are concerned, and we think the burden should be upon the respondent to show the service and establish the bar of the

limitation, or the lack of jurisdiction. He can always protect himself from an unauthorized or invalid appeal by putting the proof of such service on file in the court below and bringing it to the attention of the appellate court.

The complaint states an ordinary cause of action to quiet title. The land in question, according to the contention of the plaintiff, is that part of sections 32 and 5, which underlies the pond as shown on the subjoined plat. Her claim thereto is based on certain patents from the United States for the land abutting upon the alleged pond, and its validity depends on the effect of these patents. They include lots numbered 2, 3, and 4 of section 32 of township 10 south, range 4 west, and lots numbered 1, 2, and 3 of section 5, township 11 south, range 4 west, all in San Diego County. These sections adjoin each other. The patents state that these lots are so numbered "according to the official plat of the survey of the said lands, returned to the general land-office by the surveyor-general." The following is a copy of the part of the official plat which embraces the lots described and the pond in controversy.

The township line shown on this map was surveyed in 1854 by James E. Freeman. His field-notes referring to natural objects near the post set at the common corner of sections 4 and 5, 32 and 33, say: "A lagoon containing a few acres bears north about six chains." The section lines of these townships were surveyed in 1869 by James Pascoe. His field-notes relating to the survey of the section line between sections 4 and 5, starting from the south end, contain the following: "At seventy-nine chains twenty links, to an old corner on township line on the south bank of large pond of alkaline water. Then back on a true line. A large pond lying north of the corner to sections thirty-two and thirty-three, the corner being immediately at the edge of the pond. I set my instrument up at the corner of sections thirty-two and thirty-three on the south line of the township, with a variation of thirteen degrees east. Set a flag due north from the corner and on the north side of the pond. I then meandered around the pond." Then follow notes of courses and distances around the edge of the water designated on the map as a pond. These courses and distances correspond with and include the land claimed by the defendant Johnstone. The plat of township 10 was approved April 5, 1881; that of township 11 was approved December 24, 1870. One patent was executed on July 25, 1882; the other, that for lots 1 and 2 of section 5, on May 13, 1890.

The defendant Johnstone, claims under a patent from the state of California, issued March 10, 1906, purporting to convey to him all the land included in the meander lines of the pond as set forth in the field-notes of the Pascoe survey aforesaid, as "swamp and overflowed lands;" obviously referring to the lands granted to the state of California by the act of Congress of September 28, 1850. (9 U. S. Stats. 519.) This patent does not refer to the field-notes or any plat of the United States survey, but it sets forth the courses and distances thereof at length, and it includes all the land marked as "pond" on the aforesaid plat. The defendant Hale, has no interest except as a mortgagee under a mortgage executed by Johnstone to her.

The theory of the plaintiff is that the patents from the United States are to be construed as grants of land bordering upon a body of water, and that in consequence thereof

the title of the owner of the land, under the laws of California, extend to and include the bed thereof up to the center. The defendant Johnstone, on the other hand, claims that the line of the land is the meander line described, that the pond in controversy is not such a body of water as would give riparian rights to the owner of land along its border, and that it was of the character known as swamp and overflowed land, which vested in the state of California upon the passage of the act of 1850 aforesaid, and by the patent from the state became vested in him.

The rule controlling the construction of a patent and its effect upon the title to the land granted, is stated by the supreme court of the United States in *Packer* v. *Bird,* 137 U. S. 669, [11 Sup. Ct. 210], a case arising in California, in the following words: "The courts of the United States will construe the grants of the general government without reference to the rules of construction adopted by the state for their grants; but whatever incidents or rights attach to the ownership of property conveyed by the government will be determined by the states. . . . As an incident of such ownership, the right of the riparian owner, where the waters are above the influence of the tide, will be limited according to the law of the state, either to high or low-water mark, or will extend to the middle of the stream." This rule is approved and followed in *Hardin* v. *Jordan,* 140 U. S. 384, [11 Sup. Ct. 808, 838]; *Mitchell* v. *Smale,* 140 U. S. 412, [11 Sup. Ct. 819]; *Kean* v. *Calumet etc. Co.,* 190 U. S. 459, [23 Sup. Ct. 651]; and *Hardin* v. *Shedd,* 190 U. S. 519, [23 Sup. Ct. 685].

The law of California, with respect to certain incidents attaching to land bordering upon waters, is settled by section 830 of the Civil Code as follows:—

"Except where the grant under which the land is held indicates a different intent, the owner of the upland, when it borders on tidewater, takes to ordinary high-water mark; when it borders upon a navigable lake or stream, where there is no tide, the owner takes to the edge of the lake or stream, at low-water mark; when it borders upon any other water, the owner takes to the middle of the lake or stream."

It is conceded that the pond in controversy is not navigable. The question whether it was navigable or not was not directly put in issue by the pleadings, and there is no express finding

on the subject, but the findings give a description of the pond, showing it to be of such a character that it could not be navigable, and the evidence shows without doubt that it is not navigable.  Consequently, if it is a pond at all, it comes within the class described as "any other water," in the last clause of the section, and, unless a different intent appears from the patents and documents referred to therein, the patentee of the land bordering upon it takes to the center of the pond.

The reference in the patents to the official plat and survey make the plat and the field-notes of the survey a part of the description of the land granted, as fully as if they were incorporated at length in the patents.  This rule is followed both by the courts of this state and by those of the United States.  (*Chapman* v. *Polack,* 70 Cal. 493-494, [11 Pac. 764]; *Seaward* v. *Malotte,* 15 Cal. 306; *Vance* v. *Fore,* 24 Cal. 444; *Powers* v. *Jackson,* 50 Cal. 429; *Heath* v. *Wallace,* 138 U. S. 583, [11 Sup. Ct. 380]; *Cragin* v. *Powell,* 128 U. S. 691, [9 Sup. Ct. 203].)

The patents expressly declare that they grant the lots mentioned and that they contain a stated number of acres, being the same number of acres mentioned in the plat of the corresponding lots.  It is claimed that this shows an intent to grant no more than the stated number of acres, and to make the meander line the boundary, and not the shore line of the pond.  This claim is disposed of by the following passage from *Hardin* v. *Jordan,* 140 U. S. 384, [11 Sup. Ct. 808]: It has been the practice of the government from its origin, in disposing of the public lands, to measure the price to be paid for them by the quantity of upland granted, no charge being made for the lands under the bed of the stream, or other body of water.  The meander lines run along or near the margin of such waters are run for the purpose of ascertaining the exact quantity of the upland to be charged for, and not for the purpose of limiting the title of the grantee to such meander lines.  It has frequently been held, both by the federal and state courts, that such meander lines are intended for the purpose of bounding and abutting the lands granted upon the waters whose margins are thus meandered; and that the waters themselves constitute the real boundary."  (See, also, *Railroad Co.* v. *Schurmeir,* 74 U. S. 287.)  And in that case, upon this rule,

it was held that the title of the owner of a lot bounded by the meander lines of a lake extended over the line to the water's edge, and, by construction, according to the law of the state in which it lay, to the center of the lake. In that case, as in this, the patent stated the number of acres granted to be the same as those marked upon the plat as the area of the particular lot mentioned, and that acreage included only the acreage inclosed by the survey lines, and did not include any part of the area beyond them, or between them and the water's edge. This rule of construction was followed in all of the other cases in the United States court above cited.

In opposition to these views the appellant cites *Grant* v. *Hemphill,* 92 Iowa, 218, [59 N. W. 263, 60 N. W. 618] ; *Carr* v. *Moore,* 119 Iowa, 152, [97 Am. St. Rep, 292, 93 N. W. 52] ; *Schlosser* v. *Hemphill,* 118 Iowa, 452, [90 N. W. 842] ; *Wright* v. *Council Bluffs,* 130 Iowa, 274, [114 Am. St. Rep. 412, 104 N. W. 492] ; *Horne* v. *Smith,* 154 U. S. 40, [15 Sup. Ct. 988] ; *Niles* v. *Cedar Point Club,* 175 U. S. 305, [20 Sup. Ct. 124] ; and *French-Glenn Co.* v. *Springer,* 185 U. S. 47, [22 Sup. Ct. 563]. In some of these cases it is held that a marsh is not a body of water within the meaning of the aforesaid rule as to meander lines. Others merely follow the Iowa rule regarding riparian rights, to the effect that the owner of land along any body of water, whether navigable or not, has no right or title beyond the edge of the water. None of these has any application to this case. *Horne* v. *Smith* is not favorable to the appellant. In *French-Glenn Co.* v. *Springer,* the court says: "While the plats are conclusive as to the meander line, and while if there is a lake abutting on or to the north of the lots, the plaintiff in error would take all land between the meander line and the water, it was competent for the defendant to show that there was not, at the time of the survey nor since, any such lake, and to contend that, in such a state of facts, there could be no intervening land and no accretion by reliction." The trial court had found that at the time of the survey and since there was not any lake abutting the lots. The evidence in the case at bar would not justify such a finding and the court below found the contrary. Taken most favorably to the defendant, the evidence tended to show that the area of the pond varied according to the seasons, that there was always some water in it and that when it was

full the meander line practically coincided with its margin. It was full at the time of the sectional survey. At all times when the water did not come to the line, the character of the exposed land plainly indicated that it was the bed of a pond or lake. The case is not at all parallel to *French-Glenn Co.* v. *Springer.* The language of the court in *Mitchell* v. *Smale* is exactly applicable here: "The patents when issued refer to this plat for identification of the lots conveyed, and are equivalent to and have the legal effect of a declaration that they extend to and are bounded by the lake or stream. Such lake or stream itself, as a natural object or monument, is virtually and truly one of the calls of the description or boundary of the premises conveyed; and all the legal consequences of such a boundary, in the matter of riparian rights and title to land under water, regularly follow." (140 U. S. 413, [11 Sup. Ct. 821].) By section 830 aforesaid, the title to the land patented to the predecessors of the plaintiff extends to the center of the pond. There is no distinction in this respect between lakes and ponds. Whether or not such title should be extended beyond the lines of the subdivisions bordering on the pond if they were extended into the pond, so as to include other subdivisions lying wholly within the pond, is a question which, as we understand the plat, does not arise in the case. But see 3 Farnham on Waters, sec. 843, and *Grand Rapids etc. Co.* v. *South Grand R. etc. Co.*, 102 Mich. 227, [47 Am. St. Rep. 516, 60 N. W. 681].

It remains to consider whether or not the title to the land within the meander lines and constituting the pond passed to the state of California by virtue of the Swamp Land Act of 1850. As this is a federal question, the decisions of the United States supreme court regarding it are controlling.

It has been repeatedly decided that the Swamp Land Act of September 28, 1850 was, in effect, a present grant of all the "swamp and overflowed lands" then belonging to the United States, situated within the limits of the state, and that the title of the state thereto did not depend on the actual issuance to the state of the patent therefor, as directed in the act itself. (*Owens* v. *Jackson,* 9 Cal. 322; *Summers* v. *Dickinson,* 9 Cal. 554; *Kernan* v. *Griffith,* 27 Cal. 89; *Tubbs* v. *Wilhoit,* 73 Cal. 63, [14 Pac. 361]; *French* v. *Fyan,* 93

U. S. 170; *Wright* v. *Roseberry*, 121 U. S. 488, 509, [7 Sup. Ct. 985]; *Tubbs* v. *Wilhoit*, 138 U. S. 137, [11 Sup. Ct. 279].) It "is a present legislative grant of all the public lands within the state of the quality mentioned. The patent is matter of evidence and description by metes and bounds. The office of the patent is to make the description of the lands definite and conclusive, as between the United States and the state." (*Owens* v. *Jackson*, 9 Cal. 322.) The act of 1850, however, did not identify the particular lands granted. It granted them only by the general description "swamp and overflowed lands." Identification was necessary in order to determine whether or not any particular tract came within the general description and passed by the grant. To facilitate this identification of such lands in California, Congress passed the act of July 23, 1866. (14 U. S. Stats., 218.) That act provided four methods of identification by the executive departments of the state of California and the United States: 1. It directed the commissioner of the general land-office, when the government plat was approved, to certify to the state, as swamp and overflowed land, all lands represented as such on the approved plat. This was to be done within one year after the approval of the plat; 2. The surveyor-general of the United States was to examine the "segregation maps and surveys of the swamp and overflowed lands made by said state," and, if they conformed to the United States system of surveys, he was directed to make township plats conforming to said state surveys and such amended plats, showing as swamp and overflowed lands those represented as such by the state surveys, were to be approved by the commissioner of the general land-office; 3. Where such state surveys did not conform to the system of the United States, and in all townships not then surveyed, upon application to the surveyor-general by the governor of the state, the surveyor-general, within one year after such application, was to make segregation surveys and maps showing what land was swamp and overflowed, under the grant, according to the best evidence he could' obtain; 4. If the authorities of the state should claim, as swamp and overflowed land, any land not represented as such in the maps and surveys made and approved by the United States authorities, the character of such land at the date of the grant, September 28.

1850, was to be decided by the surveyor-general, upon testimony taken before him, subject to the approval of the general land-office.

On May 13, 1861, the legislature of California passed an act establishing a board of swamp land commissioners and providing that immediately after its organization the several county surveyors should make surveys and plats of the lands within their respective counties, showing thereon all the swamp and overflowed lands, and file the same with the state surveyor-general, who should compile a general state map therefrom which should be forwarded by the governor to the United States as an exhibit of the lands claimed by the state under the said act of 1850. (Stats. 1861, p. 355, secs. 19, 20, 21, and 22.) In *Heath* v. *Wallace,* 138 U. S. 583, [11 Sup. Ct. 380], it was held that the "segregation maps" to be examined by the United States surveyor-general according to the second plan of identification provided in the act of July 23, 1866, as above stated, were the state maps forwarded under the act of 1861 aforesaid to the United States authorities, and that surveys made after the passage of the act of 1866, by county surveyors under the direction of the state surveyor-general, at the instance of one applying to purchase the land from the state, were mere private surveys, of no official force, and were not those referred to by the act of 1866. In this, that court, deeming it a matter of state cognizance, avowedly followed the decision of this court in *Sutton* v. *Fassett,* 51 Cal. 12, to the same effect.

The defendant Johnstone, in the year 1905, made application to the state surveyor-general to purchase the land in dispute from the state, as land uncovered by the recession of inland lakes under the California statute of 1893. (Stats. 1893, p. 341.) Apparently the state by that statute intended to treat such land as swamp and overflowed land coming within the grant of 1850. (*McCord* v. *Slavin,* 143 Cal. 329, [76 Pac. 1104].) It had no other title thereto. The United States has not granted to the state the lands uncovered by the recession or drainage of inland lakes or ponds. Whether or not the lands of navigable lakes or ponds, so uncovered, is, or is not, the property of the state, is a question not involved here, since this pond has never been navigable. Under the provisions of section 830 of the Civil Code, afore-

said, the lands within the limits of an unnavigable lake or
pond, which may be uncovered by the recession thereof, be-
longs to the owners of the abutting upland. Hence, the title,
if any, which Johnstone obtained by the patent issued to him
upon this application, is good only upon the condition that
the land passed to the state as swamp and overflowed land
under the said act of 1850. The survey made in pursuance
of his application in 1905 was not a "segregation map" within
the meaning of the second method of identification provided
by the act of July 23, 1866. It did not determine that the
land had passed to the state.

In *Tubbs* v. *Wilhoit*, 138 U. S. 139, [11 Sup. Ct. 279], the
supreme court of the United States declared that the scheme
provided by the act of July 23, 1866, for the identification
of swamp and overflowed lands in California, superseded all
previous rules and methods for that purpose. This land does
not appear to have been identified as such by either of these
methods. On the contrary, it has been identified as land of
the United States by the method first above stated. It was
represented on the official township plats, approved in 1870
and 1881, respectively, by the United States surveyor-general
and acquiesced in by the state authorities, not as swamp and
overflowed lands, but as land covered by the waters of a per-
manent pond, that is, as lands belonging to the United States.
This was a determination as to the fact of the matter intrusted
to that officer to decide. (*McCabe* v. *Goodwin,* 106 Cal. 486,
489, [39 Pac. 941].) It was not certified to the state as
swamp and overflowed land, or represented as such on those
official plats. Nothing was done which would class it as
swamp land within the first method of identification above
mentioned. It was not included within any segregation map
prepared by the state under the statute of 1861, as provided
by the second method. The United States surveys of these
townships were made after the passage of the act of 1866
and they were unsurveyed at that time. If the governor has
applied to the United States surveyor-general to have the
swamp lands in those townships segregated and certified to
the state, the result has been that these lands have been
excluded from the segregation, and certification thereof has
been refused. Consequently, they have not been identified
as provided by the third method. It does not appear that the

governor, or any other state officer has claimed these lands as lands belonging to the state and in reality swamp and over-flowed, although not represented as such on the official plats of the United States survey, and therefore the state could not have obtained them under the fourth method. If any such proceedings had been taken, we would be required to take judicial notice of them as public official acts of the executive officers of this state and the United States. (Code Civ. Proc., sec. 1875, subd. 3.)

Under these circumstances, parol evidence is not admissible to prove that, although the land has thus been identified by the authorities of the United States, intrusted with that office, as lands which did not pass to the state under the act of 1850, it was, nevertheless, in fact, swamp and overflowed land at that date and by virtue of that grant became the property of the state. The only decision that lends color to the proposition that such evidence is admissible for that purpose, is *Railroad Co.* v. *Smith,* 76 U. S. 95. In that case there had been a failure on the part of the secretary of the interior, extending through many years after the passage of the Swamp Land Act, to examine the lands within the state of Missouri, in which the land in dispute lay, and to segregate the swamp and overflowed land and certify it to the state as directed by the act of 1850. In the mean time the state had disposed of this and other lands to private persons, claiming the right to do so on the ground that it was swamp land and that the grant of 1850 had vested title in the state. The title coming in question between the purchaser and persons claiming under a subsequent disposition thereof by the United States. evidence was admitted to show the actual character of the land at the date of the act of 1850. This was held to have been properly admitted, the court saying: "The matter to be shown is one of observation and examination, and whether arising before the secretary, whose duty it was primarily to decide it, or before the court, whose duty it became because the secretary had failed to do it, this was clearly the best evidence to be had, and was sufficient for that purpose." But in the case at bar there has been no failure on the part of the officers of the United States to perform the duty of identify-ing this land. It has been identified as land of the United States. It is not contended that the official plat did not

purport to show its character and thereby identify it in the manner provided by the act of 1866. Appellant's claim is that the showing made on the map was false, that the "pond" shown thereon as covering this land, was not a permanent pond as shown, but a mere temporary and intermittent collection of surface water from the adjacent land.

The subsequent decisions of the United States supreme court expressly limit the rule of *Railroad Co.* v. *Smith* to cases where the officer of the United States, whose duty it was to identify and certify swamp and overflowed lands to the states, has neglected and failed to do that duty. In *Wright* v. *Roseberry,* 121 U. S. 509, [7 Sup. Ct. 985], after an elaborate review of the authorities relating to the steps necessary to complete the transfer of the legal title to such lands to the states, the court says: "The result of these decisions is, that the grant of 1850, is one *in præsenti,* passing the title to the lands as of its date, but requiring identification of the lands to render the title perfect; that the action of the secretary in identifying them is conclusive against collateral attack, as the judgment of a special tribunal to which the determination of the matter is intrusted; but, when that officer has neglected or failed to make the identification, it is competent for the grantees of the state, to prevent their rights from being defeated, to identify the lands in any other appropriate mode which will effect that object." Speaking of California lands, which were under consideration, it was further stated that the act of July 23, 1866, changed the law so far as lands in that state are concerned, and "no longer left their identification to the secretary of the interior, but provided for such identification by the joint action of the state and federal authorities." Under the joint action thus provided, the land has been identified, and under the principle just stated, that identification is conclusive against collateral attack, such as that here proposed. In *French* v. *Fyan,* [93 U. S. 170], parol evidence was held to be inadmissible and referring to *Railroad* v. *Smith* as holding the contrary, it is said: "The admission was placed expressly on the ground that the secretary of the interior had neglected or refused to do his duty; that he had made no selection or list of the land and would issue no patents, although many years had elapsed since the passage of the act. . . . There is in this no conflict with what we decide

in the present case, but, on the contrary, the strongest impli-
cation that if, in that case, the secretary had made any
decision, the evidence would have been excluded." The early
California decisions, inconsistent with this, were expressly
disapproved. Justice Miller wrote the decisions in both cases.
Similar explanations of *Railroad* v. *Smith* were made in *Ehr-
hardt* v. *Hogaboom,* 115 U. S. 67, [5 Sup. Ct. 1157] ; *Chandler*
v. *Calumet etc. Co.,* 149 U. S. 79, [13 Sup. Ct. 798] ; and
*McCormick* v. *Hayes,* 159 U. S. 338, [16 Sup. Ct. 37], and
parol evidence to controvert the decision actually made by
the proper officers in identification of such lands was declared
to be inadmissible.

On principle this would seem to be the effect of the terms
of the act of 1850, without reference to authority. The descrip-
tion of the lands thereby granted *in præsenti* as "swamp and
overflowed lands, made unfit thereby for cultivation," was
general and indefinite. Identification was necessary. The
act provided therefor, by making it the duty of the secretary
of the interior to make a list of "the lands described as afore-
said, and transmit the same to the governor of the state," and
cause a patent to be issued, on which the fee simple was to
vest in the state. Obviously the grant was in a certain sense
conditional and was limited to the lands listed by the sec-
retary as "the lands described." He was appointed by the
grantor as the person to make the selection according to the
facts and his determination was binding on the states, in the
absence of fraud or mistake. The act of 1866 committed the
selection to other officers but did not alter the binding effect
of the decision. And if it is to be revised on the ground of
fraud or mistake, such revision must be by a direct proceed-
ing for that purpose. It is not to be allowed at any time and
in any collateral matter in which the fact may appear to be
material.

The court below correctly held that the plaintiff was the
owner of the part of the pond lying within sections 32 and 5
and in giving judgment to that effect. The defendant ob-
tained no title thereto by his patent from the state.

The judgment and order are affirmed.

Angellotti, J., and Sloss, J., concurred.

Hearing in Bank denied.