## CITY OF LOS ANGELES v. BORAX CONSOLIDATED LIMITED et al.*

### No. 7427.

Circuit Court of Appeals, Ninth Circuit.

Jan. 14, 1935.

Ray L. Chesebro, City Atty., Robert F. Shippee, Asst. City Atty., and Loren A. Butts, all of Los Angeles, Cal., for appellants.

Newlin & Ashburn, of Los Angeles, Cal. (A. W. Ashburn, of Los Angeles, Cal., of counsel), for appellees.

Before WILBUR and GARRECHT, Circuit Judges.

WILBUR, Circuit Judge.

Appellant brought this action to quiet title to a portion of the shore of Mormon Island, situated within the Inner Bay of San Pedro Harbor. The appellant alleged that it was the owner of certain tidelands by virtue of a grant thereof by the state of California (St. Cal. 1911, p. 1256). These lands are described with particularity by metes and bounds. The appellees answered, denied title in the city, and alleged that the lands were not tidelands, and alleged that they were the owners of the lands described in the complaint. Appellees also, by way of counterclaim, alleged that the land in question belonged to the appellee Borax Consolidated Limited, an English corporation, and also by separate counterclaim alleged that the city was estopped to deny the ownership of said land by the appellee Borax Consolidated Limited, by reason of the inaction of the city and its officials during a long period of time in which the appellees expended more than a million dollars in improvement of the land in question. A third counterclaim sets up an estoppel by a judgment of dismissal which it is alleged was the result of a retraxit by the city and by the state of California in a prior

*Rehearing denied March 25, 1935.

action brought by the state of California before it had transferred title to the city of Los Angeles and dismissed after the city had acquired title. The appellees claim under a patent of the United States government issued to William Banning December 30, 1881 under the pre-emption laws of United States (enacted April 24, 1820 [3 Stat. 566]). The description in the patent is as follows:

"Lot numbered one, of section eight, in township five south, of range thirteen west of San Bernardino Meridian, in California, containing eighteen acres, and eighty-eight hundredths of an acre, according to the official plat of the survey of the said lands, returned to the General Land Office by the Surveyor General."

The plat referred to in the patent contains the following statement with reference to the lot in question: Meanders of shore of Mormon Island, surveyed by W. H. Norway under contract dated March 10, 1880, surveyed March 24, 1880, amount of survey 77 chains and 40 links. Area of land surveyed by Norway 18.88 acres. Meanders of the shore of Mormon Island beginning at the meander corner 1, at ordinary high-water mark; thence along the shore of the island. Then follows a statement of courses and distances from stations 1 to 14 and to the beginning.

■ It is clear from the plat that the lines in question were meander lines, and therefore that the boundary line of the land covered by the patent is the shore line of Mormon Island and not the traverse lines of the patent. Jefferis v. East Omaha Land Co., 134 U. S. 178, 10 S. Ct. 518, 523, 33 L. Ed. 872; St. Paul & P. Railroad Co. v. Schurmeir, 7 Wall. (74 U. S.) 272, 19 L. Ed. 74; St. Louis v. Rutz, 138 U. S. 226, 11 S. Ct. 337, 34 L. Ed. 941; Producers' Oil Co. v. Hanzen, 238 U. S. 325, 35 S. Ct. 755, 59 L. Ed. 1330; United States v. Boynton et al. (C. C. A.) 53 F.(2d) 297; Los Angeles v. S. P., L. A. & S. L. R. R. Co., 182 Cal. 652, 189 P. 449. This was the ruling by the Supreme Court of the state of California in an opinion written by the author of this opinion dealing with a similar description in the patent of Rancho San Pedro as it was affected by the lines of the Inner Bay exception. In that case the plat did not distinctly state that the lines of the patent were meander lines, but it is clearly inferable from the plat that the lines were meander lines. The rule in regard to meander lines is stated by the Supreme Court in Jefferis v. East Omaha Land Co., supra:

"Meander lines are run in surveying * * * public lands bordering upon navigable rivers, not as boundaries of the tract, but * * * as the means of ascertaining the quantity of the land * * * subject to sale, and * * * the water-course, and not the meander line, as actually run on the land, is the boundary."

In United States v. Boynton et al., 53 F. (2d) 297, 298, in an opinion written by District Judge James, this court held:

"Thus, the question we have to determine is whether Snow, in indicating a high-tide line, definitely fixed a shore line survey. Meander lines, as used in land surveys, where they indicate a course along navigable waters, refer to the line as the water itself may delineate it, subject to changes that different tides or water flows may work. St. Paul & P. R. Co. v. Schurmeir, 7 Wall. (74 U. S.) 272, 19 L. Ed. 74; Hardin v. Jordan, 140 U. S. 371, 11 S. Ct. 808, 838, 35 L. Ed. 428; Taylor v. United States (C. C. A.) 44 F.(2d) 531. Because a meander line, as carried into field notes, shows corners, posts, monuments, and courses, does not result in the line so delineated becoming definite and fixed. Some action must have been taken, or words used in the instrument of conveyance, which will show that the grantor has agreed that such line shall be considered as having more than its assigned character; it must be agreed that it indicates a definite boundary limit."

■ These principles are insisted upon by the appellant and are not disputed by the appellees. The difference between the parties in the case at bar arises from the fact that, according to the contention of the appellant, the stations 4 to 11, inclusive, and the meander line connecting them, all lie below the line of ordinary high tide. The lands claimed by the appellees lie within the traverse lines connecting stations 3 and 12 of the patent, and north of a line running north 78° 23″ west, distant 345 feet connecting traverse lines last mentioned, the exact location of which is unnecessary to fix for our present purposes. The appellant's contention is that, inasmuch as the lines bounding Mormon Island are meander lines, the lines themselves may be wholly disregarded in fixing the position and area of the uplands of Mormon Island. The contention of the appellees is that it was the duty of the government surveyor who surveyed Mormon Island to determine the location of the boundary between the uplands which were to be conveyed by patent from the govern-

ment, and the shore which belonged to the state by virtue of its sovereignty, and that the stations purporting to be on the shore line must be held as defining the shore line, and it is claimed in effect that, in the absence of proof of the exact location of the shore line between the stations, the traverse line should be taken as the shore line. The trial court sustained the appellees' contention and held that the shore line was conclusively determined by the patent and that the city could not prove its actual location.

Mormon Island, aside from a small area, is composed of mud flats, the surface of which is in places almost horizontal, and in other places the plane of the surface forms a very acute angle with the horizontal so the small additional rise of the tide will result in the flooding of a large area of the ground. At the time of the patent these lands were comparatively worthless, but, by reason of the improvement of Los Angeles Harbor by dredging and filling, they have become extremely valuable. The evidence shows that the city paid at the rate of $49,000 per acre for a portion of the unimproved upland of Mormon Island.

To support the conclusion of the trial court that the Surveyor General had jurisdiction to decide the location of the shore line and having done so that his determination is conclusive upon the courts, the case principally relied upon by the appellees is Knight v. United Land Ass'n, 142 U. S. 161, 12 S. Ct. 258, 35 L. Ed. 974, dealing with title to lands in Mission creek, a tidal tributary to San Francisco Bay. It was held by the Supreme Court in that case that the lines run by the Surveyor General in pursuance of a decree confirming a land grant by the republic of Mexico to the pueblo of San Francisco, purporting to follow the mean high tide line, was conclusive as to the location of that line, and therefore that the question of whether or not the submerged lands of Mission creek were conveyed by the patent to the pueblo was not open for consideration regardless of the question as to whether or not the lands, beneath Mission creek were tidelands. That case, however, has no application to the situation involved in the case at bar, as is clearly pointed out in the opinion. There the duty of ascertaining and delimiting Mexican grants was conferred upon the federal courts. The rights granted by Mexico to tidelands were prior to the rights thereto of our federal or state governments. Consequently, if the Mexican grant conveyed tidelands, the title thereto

was vested in the grantee regardless of the fact that such land would otherwise belong to the state by virtue of its sovereignty. The determination of the lines of the Mexican grant was made by the federal government in the mode prescribed in order to comply with the Treaty of Guadalupe Hidalgo (9 Stat. 922). As pointed out by Justice Field in his concurring opinion, 142 U. S. 161, 204, 12 S. Ct. 258, 35 L. Ed. 974, the Supreme Court of California, prior to the decision by it in the Knight Case (United Land Ass'n v. Knight), 85 Cal. 448, 24 P. 818, then under review, had consistently followed the rule that the lines of the United States patent confirming and delimiting the Mexican grant were conclusive. Moore v. Wilkinson, 13 Cal. 478; People v. San Francisco, 75 Cal. 388, 17 P. 522. No such situation is presented in the case at bar.

Here the title to the tidelands vested in the state of California long before the survey in question was made. No authority was vested by law in the Surveyor General to determine the boundary line between the tideland belonging to the state and the upland belonging to the United States. Even if it be conceded that such jurisdiction existed in the federal government, there was no attempt to exercise such jurisdiction. The survey was to determine the amount of the upland for the purpose of fixing the amount to be paid by the patentee for the land. Jefferis v. East Omaha Land Co., supra. Congress has given no authority to the Interior Department to dispose of tidelands belonging to the state or to the nation. The Interior Department did not purport to exercise any such authority. The case of Knight v. United Land Ass'n, supra, is not applicable to the survey in question.

The appellees also rely upon an entirely distinct line of cases dealing with swamp and overflowed lands. These lands were granted to the state by the federal government by the Arkansas Act of September 28, 1850, 9 Stat. 519 (see 43 USCA § 982 et seq.). This statute in addition to the grant in præsenti to the states provided for the survey and segregation thereof by the officers of the federal government. It has been held that, pending the survey of such lands, the state acquired an equitable title of which it could dispose subject to the subsequent identification of the land in the manner provided by law. Wright v. Roseberry, 121 U. S. 509, 7 S. Ct. 985, 30 L. Ed. 1039; Tubbs v. Wilhoit, 138 U. S. 134, 11 S. Ct. 279, 34 L. Ed. 887; Foss v. Johnstone, 158 Cal. 119,

131, 134, 135, 110 P. 294. Under such circumstances it is held that the act of the officers of the federal government in delimiting the swamp and overflowed lands thus conveyed is conclusive against collateral attack in both the state and federal courts as to the character of the land. The cases of Foss v. Johnstone, 158 Cal. 119, 110 P. 294; Bates v. Halstead, 130 Cal. 62, 62 P. 305, 80 Am. St. Rep. 70; Cragin v. Powell, 128 U. S. 691, 9 S. Ct. 203, 32 L. Ed. 566; Northern Pac. R. Co. v. McComas, 250 U. S. 387, 39 S. Ct. 546, 63 L. Ed. 1049, 1053; Heath v. Wallace, 138 U. S. 573, 11 S. Ct. 380, 34 L. Ed. 1063; French v. Fyan, 93 U. S. 169, 23 L. Ed. 812; Chandler v. Calumet, etc., Co., 149 U. S. 79, 13 S. Ct. 798, 37 L. Ed. 657, deal with swamp and overflowed land, and have no application to surveys of lands bordering navigable waters made under the preemption laws for the purpose of fixing the quantity of land to be conveyed by patent where such lands are bounded by tide water.

We conclude, then, that the shore line of Mormon Island is the boundary of the land granted; that the federal government had neither the power nor the intention of conveying tidelands by the patent to Banning; that the rights of the patentee and his grantees are limited to the upland of the Island. Gary Land Co. v. Griesel, 179 Ind. 204, 100 N. E. 673; Kean v. Calumet Canal & Imp. Co., 190 U. S. 452, 23 S. Ct. 651, 47 L. Ed. 1134; St. Paul & P. R. R. Co. v. Schurmeir, 7 Wall. (74 U. S.) 272, 19 L. Ed. 74, supra. In view of the erroneous ruling of the trial court holding the stations and traverse lines of the patent conclusive as to the location of the shore line, it will be necessary to reverse the decision and remand the case for a new trial.

■ The appellees seek to sustain the decree upon several grounds which we will briefly notice. Their contention that the facts stated in the counts setting up estoppel in pais and by judgment are sufficiently admitted by appellant's reply to justify a decree in their favor will not be considered in view of the fact that the question was not presented to or considered by the trial court.

■ Appellees seek to support the judgment upon several grounds affecting the allegation and proof of appellant in regard to its title. The failure of the appellant to prove its case would not be decisive on appeal, for the reason that the defendant secured an affirmative judgment quieting its title and the question on appeal is whether this affirmative judgment in favor of appellees can be affirmed.

Appellees advance numerous contentions in regard to the failure of appellant to allege and prove the boundary line of Mormon Island. These questions are only important from the standpoint of a new trial. For the guidance of the trial court upon a new trial we feel that one contention of the appellees as to the boundary line between the upland and the tideland of the island should be considered.

■ In the case at bar the importance of the location of the exact position of the line of ordinary high water is manifest from the statement by the appellees in their brief that, "the lowering or raising by one-tenth of a foot may result in the gain or loss of acres, and there are only seven acres here involved." In this opinion we have so far referred to that line as the "shore line" in order to avoid the confusion which would have arisen from dealing with that issue in connection with the legal question as to the conclusiveness of the meander line of the patent as locating the line of ordinary high tide. We will now consider the location of the shore line. It has been assumed by the appellant that the mean high tide line is that boundary line, and that this line is 5.1 feet above the mean low tide line in the Bay of San Pedro whose waters surround Mormon Island. This was the boundary line fixed by the courts of California in the case of Los Angeles v. San Pedro, supra, involving tidelands in the Inner Harbor at San Pedro. It is true, however, as appellees state, that this line 5.1 feet above mean low tide was agreed upon by the parties and upon that basis assumed by the court to be the boundary line between the tidelands and the upland. It is shown by reports of the government engineers contained in the record that 5.1 feet was the elevation of the plane of mean high water above that of mean low water. The exact height of the mean high tide line above the mean low water, that is, whether 5.8 feet, 5.1 feet or 4.7 feet, we need not consider on this appeal. That question is one of fact which should be determined by the trial court in the first instance. The appellant, however, contends for the rule that the boundary line between the tidelands and upland is determined "by definite mark upon the ground which has been left by the tide." This rule as to a definite mark is applicable to the high-water line of streams but not to a boundary line of tidewaters. The appellees contend that the 4.7 line is the

shore line and relies in support of that contention upon the rule defining the boundary line between tidelands and upland stated in Teschemacher v. Thompson, 18 Cal. 11, 79 Am. Dec. 151, by Justice Field, who was then a member of the Supreme Court of the state of California, and that this rule makes the line reached by the neap tides the boundary line, and that neap tides within this rule are those described in the publication issued by the United States Coast and Geodetic Survey, Special Publication No. 135, defining neap tides, as follows:

"When the moon is in its first and third quarters, the tidal forces of sun and moon are opposed and the tide does not rise as high nor fall as low as on the average. At such times the tides are called 'neap tides' and the range of the tide then is known as the 'neap range.'"

The rule as stated by Justice Field in Teschemacher v. Thompson, supra, is as follows:

"The limit of the monthly Spring tides is, in one sense, the usual high water mark; for, as often as those tides occur, to that limit the flow extends. But it is not the limit to which we refer when we speak of 'usual' or 'ordinary' high water mark. By that designation we mean the limit reached by the neap tides; that is, those tides which happen between the full and change of the moon, twice in every twenty-four hours."

This statement of Justice Field, it may be observed, was dictum, for the decision was expressly placed on other grounds. Nevertheless, as this rule has been frequently quoted by the Supreme Court of California, and in as recent a case as Oakland v. E. K. Wood Lbr. Co., 211 Cal. 16, 292 P. 1076, 80 A. L. R. 379, it is important that it be considered. The excerpt which we have quoted itself contains the definition of the term "neap tides" applicable in fixing the line of ordinary high tide as "those tides which happen between the full and change of the moon, twice in every twenty-four hours." In the authority cited by Justice Field the matter is made quite clear. We quote from "Hall on the Sea Shore," as follows:

"But with us it has been long settled, that that portion only of the land adjacent to the sea, which is alternately covered and left dry by the ordinary flux and reflux of the tides is, in legal intendment, the sea-shore. * * * But in fact, no more of this unreclaimed tract is, at law, sea-shore, than that portion which lies between the high-water and low-water mark, at ordinary tides.

"The law takes notice of three kinds of tides:

"1st. The high spring tides, which are the fluxes of the sea at those tides which happen at the two equinoctials.

"2nd. The spring tides, which happen twice every month at the full and change of the moon.

"3rd. The neap, or ordinary tides, which happen between the full and change of the moon, twice in the twenty-four hours."

This excerpt shows that the change of the moon referred to is the "new moon." Consequently, the neap tides as defined by Justice Field are those which happen between the full and new moon, twice in every 24 hours. As high tides occur twice each day and differ from day to day, the line of the neap tides, as defined by Hall on the Sea Shore, would not establish any definite or fixed boundary.

It is evident when we consider the above language quoted from Hall on the Sea Shore, and, when we consider the fact that the shore line is the boundary between tillable land or land available for agricultural purposes and land so frequently covered by the sea that it is useless for agricultural purposes, that the average or mean of the high tides would be the appropriate line defining the boundary between the tillable upland and the lands which were ordinarily submerged by the tide. In other words, that the "ordinary high tide" is the "average" of all the high tides; that is, the mean high tideline. While Justice Field in the above quotation would seem to indicate that the neap tides were all the tides between the full and new moon and inferentially exclude from the definition of neap tides the spring tides occurring approximately at the time of the new and full moon, the quotation is merely a rough statement of a rule which must be more accurately defined in fixing a definite line of demarcation. There is no inherent reason why the highest tide nearest to the full and new moon should be excluded from the average. Justice Field emphasizes the fact that the spring high tide mark is not the boundary line of the tidelands. It is obvious that these spring tides must be included in the tides to be averaged if we are to determine the line usually reached, that is, reached on the average, by the high tide. This view of the line of the average high tide as the boundary line between tideland and upland is accepted in Attorney General v. Chambers, 4 De G. M. & G. 206, 43 Eng. Reprint 486, before the Lord Chancellor

Lord Cranworth, assisted by Mr. Baron Alderson and Mr. Justice Maule, decided in 1854, the associates of the Lord Chancellor recommending in part as follows:

"The medium tides therefore of each quarter of the tidal period afford a criterion which we think may be best adopted. * * * And as some not indeed perfectly accurate construction, but approximate, must be given to the words 'highest ordinary tides' used by Mr. Justice Holroyd [in Blundell v, Catterall, 5 B. & A. 268, 290] we think, after fully considering it, that this best fulfils the rules and the reasons for it, given in our books.

"We therefore beg to advise your Lordship that, in our opinion, the average of these medium tides in each quarter of lunar revolution during the year gives the limit, in the absence of all usage, to the rights of the Crown on the seashore."

Apparently this conclusion was adopted by the Lord Chancellor, although he does not distinguish between the medium tide between the spring and neap tides, and the average of those tides for the period of a year which was the line suggested by his associates. The Lord Chancellor said, "I therefore concur with the able opinion of the judges, whose valuable assistance I had, in thinking that medium line [medium high tide between the springs and the neaps] must be treated as bounding the right of the Crown." An increased knowledge of the effect of the moon and sun upon the tides and the necessity of more definite and certain delineation of the boundary line between tide lands owned by the state in its sovereign capacity, has fixed the boundary line as the mean high tide line. It is neither the spring tide nor the highest spring tide, nor the neap tides defined in accordance with the government publication above referred to, but a mean of all the high tides. To fix this mark to a certainty it is necessary to observe, or compute, the tide for many years (at least 18.6), although ordinarily it can be fixed with reasonable certainty by averaging the tides for a single month. This appears from the definition of mean high tide given in special publication No. 135, above referred to, as follows:

"Mean high water at any place is the average height of all the high waters at that place over a considerable period of time. To determine just how long a series of tide observations is required to derive a satisfactory value of mean high water it is necessary to consider in detail the variations to which high water is subject. * * *

"These variations, which are of a periodic character, are due to changes in the position of the moon with respect to phase, distance, and declination. * * *

"The daily height of high water is subject to relatively large variations both periodic and nonperiodic in character. The periodic variations depend primarily on the phase, distance, and declination of the moon, the periods of these being approximately $29\frac{1}{2}$, $27\frac{1}{2}$ and $27\frac{1}{3}$ days, respectively. Such variations are therefore largely eliminated within a month. And within a month, too, the large variations in sea level due to wind and weather tend to balance out. It follows, therefore, that a much closer approximation to the plane of mean high water can be secured from a month than from one day of observations. * * * Within the same year the monthly heights of high water may differ by as much as a foot. * * *

"Generally, consecutive yearly heights of high water at a station are seen to differ by not more than a few hundredths of a foot, though at times this difference may be as much as a quarter of a foot. Within a period of 20 years yearly values of high water may differ by as much as half a foot, even at stations free from the disturbing effects brought about by large fluctuations in river discharge. * * *

"If the height of high water above sea level from year to year is plotted for a number of years, a distinct periodic variation comes to light, the period being approximately 19 years. * * *

"From theoretical considerations of an astronomical character it follows that there should be a periodic variation in the rise of high water above sea level having a period of 18.6 years. This is brought about by the change in longitude of the moon's node, which introduces a variation in the inclination of the lunar orbit to the plane of the earth's Equator."

It would seem then that, in order to ascertain the mean high tide line with the requisite certainty needed in fixing the boundary line of valuable tidelands an average for 18.6 years should be determined as near as possible by observation or calculation. This mean high tide line is the one usually referred to by the United States government in its patents and in the work of its various departments delimiting the boundary between the upland and the tideland. The plat referred to in the patent in the case at bar fixes the mean high tide line as the boundary line, the act of the Legislature of the state

of California conveying title to the city of Los Angeles, conveys "all tide lands and submerged lands * * * situated below the line of mean high tide." Section 1.

The trial court, upon the retrial of this case, should determine the location of the mean high tide line as hereinbefore defined, as the boundary line between the land described in the Banning patent and the tideland belonging to the state of California. We have not dealt with the questions which are discussed in the brief of the appellees concerning the effect upon the tide line of the dredging of the Inner Bay at San Pedro, nor concerning the effect of the freshets. The rule with regard to these matters is too well settled to require a statement thereof in this opinion. The question of the mean high tide line is one of fact, and the effect of the shifting of that line on the rights to tideland and upland are well settled. We merely refer to the matter to make it clear that we have not passed upon that question.

The decree is reversed, and the case remanded to the trial court for further proceedings not inconsistent with this opinion.