# TUBBS *v.* WILHOIT.

**ERROR TO THE SUPREME COURT OF THE STATE OF CALIFORNIA.**

No. 450.   Submitted January 5, 1891. — Decided January 26, 1891.

The swamp land grant of September 28, 1850, to the several States was *in præsenti*, and upon identification of the lands thereunder in lawful mode, title thereto related back to the date of the grant.

The identification originally prescribed by the action of the Secretary of the Interior was changed as to such lands in California by the act of July 23, 1866, 14 Stat. 219, section four thereof prescribing new and additional modes of identification.

That act provided, among other things, that (1) all lands represented as swamp and overflowed on township plats, the surveys and plats of which townships had been made under the authority of the United States and approved, were to be certified to the State by the commissioner of the general land office within prescribed periods; and (2) existing State segregation maps and surveys of such lands found by the United States Surveyor General to conform to the existing system of the United States were directed to be made the basis of township plats, to be thereafter constructed and approved by that officer, and forwarded to the commissioner of the general land office for approval.

In 1864, United States subdivisional survey of the township embracing the land in controversy in this suit was made and approved by the United States surveyor general, and a copy of the plat thereof, also approved by him, was filed in the proper local land office. On such approved plat certain parts were colored green, and marked "swamp and overflowed land," and excluded from the estimated aggregate area of public lands shown thereon, and were included in the estimated area of swamp and overflowed land in that township. In August and September, 1864, under authority of state law, one Kile applied to purchase the land in controversy from the State under the swamp land grant, secured the requisite survey and the approval thereof by the State surveyor general; and in August, 1865, having made full payment to the State received the State's patent therefor. *Held*, that the title of the State was confirmed by the act of 1866, by the return of the land as swamp and overflowed on the survey of the United States and the township plat, approved by the United States surveyor general and filed in the local land office in 1864.

Prior to executive instructions of April 17, 1879, the commissioner's approval of the public surveys and plats was not required before filing thereof in the local offices of sale by the United States surveyor general, and on such filing the land became subject to sale, selection and disposal. Power to correct fraud or error therein existed in the commissioner, but where the survey and plat were correct they became final and effective when approved and filed in the local land office by the surveyor general.

Temporary withdrawal of the township plat prior to the passage of the act of 1866, did not defeat confirmation prescribed by that act in the present case, a certified copy of such plat having been substituted in its place and the survey thereof never having been disapproved nor changed otherwise than by the erasure of the words " swamp and overflowed " as to this and other tracts and the substitution on the plat of the words " public lands," under direction of the commissioner of the general land office given after his control over the matter had ceased. Official acceptance of the survey by the commissioner may be inferred from its adoption in making sales and issuing patents, if such approval be in fact necessary.

The homestead entry of plaintiff in error made subsequent to the making of the survey and filing of such township plat thereof in the local office, and subsequent to the state segregation survey, sale and patent of the land to Kile, and subsequent to the confirmatory act of 1866, was ineffectual against the right acquired by the State and its patentee.

Alleged inadvertence of the state court in entering judgment below for defendant for rents and profits cannot be reviewed here. Any inadvertence of the kind is only matter for consideration by the court below.

THIS was an action for the possession of land. The federal questions are stated in the opinion.

*Mr. Henry Beard* for plaintiff in error.

*Mr. A. T. Britton* and *Mr. A. B. Browne* for defendants in error.

MR. JUSTICE FIELD delivered the opinion of the court.

This is an action for the possession of a parcel of land of about eighty acres in the county of San Joaquin, California, being substantially the south half of the southeast quarter of section 11, in township 4, of that county.

The plaintiff in the court below, and in error here, asserted title to the premises under a patent of the United States issued to him in due form on the first of October, 1879, upon a homestead entry made by him in May, 1873, and commuted to a cash entry in November following.

The original defendant below, Joseph Kile, now deceased, and in whose place his executors Wilhoit and Thompson have been substituted, claimed the premises under a patent of Cali-

·fornia, bearing date the 5th of August, 1865, conveying to him the premises as swamp and overflowed lands, and as part of the land granted to the State by the act of Congress of September 28, 1850. 9 Stat. 519, c. 84.

The action was brought in the Superior Court of the county of San Joaquin, where the issue was tried without the intervention of a jury, by stipulation of the parties. Special findings of fact were filed, upon which judgment for the plaintiff was rendered. On appeal to the Supreme Court of the State the judgment was reversed, and judgment ordered in favor of the defendants for the lands, and for the rents and profits thereof. To review this judgment the case is brought here on a writ of error. The question presented is the validity of this title under the patent of California. If the claim thereto was abandoned or overthrown, the right of the plaintiff to recover under the patent of the United States would be conceded.

To determine this question, a consideration must be had of the various proceedings taken to obtain the patent of the State, and the law bearing upon them. The act of Congress of September 28, 1850, granted to the several States of the Union all the swamp and overflowed lands within their limits, which, on the passage of the act, remained unsold, to enable them to construct the necessary levees and drains for the reclamation of such lands; and made it the duty of the Secretary of the Interior, as soon as practicable, to make out an accurate list and plats of the lands described, and transmit the same to the governors of the States, and upon their request to cause patents to be issued to the States therefor.

Soon after the passage of the act the question arose in each State as to the time the grant took effect — whether at the date of the act, or on the issue of the patent to the State upon the request of its governor after the list and plats of the lands had been made out by the Secretary of the Interior and transmitted to him. After much consideration by the officers of the department of the government under whose supervision the act was to be carried out, and by the courts of the several States in which such lands existed, it was held that the words

"are hereby granted" in the act imported a present grant, and not a promise of one in the future ; and. that the title to the lands, therefore, passed to the State at once, their identification to be made by the action of the Secretary of the Interior, but when identified the title to relate back to the date of the act.

In the recent case of *Wright* v. *Roseberry*, 121 U. S. 488, the rulings of the officers of the Land Department, and of the courts of the States in which swamp and overflowed lands existed, by which the conclusion mentioned was reached, are stated with much. fulness, and it is unnecessary to repeat what is there said. It is sufficient to observe that the construction thus given to the act is now the accepted law of the country.

But the enjoyment of the grant was greatly impeded by the delay of the Interior Department to make out and certify the lists required. This delay arose from many causes, some of which the secretary could not control, such as the insufficiency of the force under his command to make the required surveys and the necessary identification of the lands. The decision of this court in *Railroad Co.* v. *Smith*, 9 Wall. 95, tended in some degree to lessen the evil effects of the delay, in holding that when that officer had neglected or failed to make the identification, it was competent for the grantees of the State, in order to prevent their rights from being defeated, to identify the lands in any other appropriate mode which would effect that object. And in *Wright* v. *Roseberry* it was suggested that such mode of identification by the State was also permissible where the secretary declared his inability to certify the lands from any other cause than a consideration of their character — a suggestion followed in the decision of that case.

In consequence of the delays in certifying the lists and the inconveniences which followed, the legislatures of several States, in which such lands existed, undertook to identify the lands and dispose of them, and for that purpose passed various acts for their survey and sale and the issue of patents to purchasers. The conflicts which thus arose between parties

claiming under the State and parties claiming directly from the United States led to various acts of Congress for the relief of purchasers and locators of swamp and overflowed lands. Act of March 2, 1855, 10 Stat. 634, c. 147; Act of March 3, 1857, 11 Stat. 251, c. 117.

The inconvenience and conflicts mentioned were especially annoying and injurious to the State of California, for the great emigration to that State in 1850, and the years immediately following, created a call for lands of this description, not only because they were easily reclaimed, but because of their extraordinary fertility after reclamation. Accordingly, as early as 1855 its legislature, asserting her ownership of such lands, provided for their survey and sale, and for the issue of patents. Legislation was also had on that subject in 1857, 1858 and 1859. As great confusion had, from the causes mentioned, arisen in the title to such lands, and also to other lands in California claimed under grants of the United States, Congress, on July 23, 1866, passed an act, entitled "An Act to quiet Land Titles in California," 14 Stat. 218, c. 219, by which, among other things, the provisions of the original act of 1850 for the identification of swamp and overflowed lands in that State were changed. Their identification was no longer left to the Secretary of the Interior, but was made subject to the joint action of the state and the federal authorities. The fourth section, which related to those lands, provided as follows :

"That in all cases where township surveys have been, or shall hereafter be made under authority of the United States, and the plats thereof approved, it shall be the duty of the commissioner of the general land office to certify over to the State of California, as swamp and overflowed, all the lands represented as such, upon such approved plats, within one year from the passage of this act, or within one year from the return and approval of such township plats. The commissioner shall direct the United States surveyor general for the State of California to examine the segregation maps and surveys of the swamp and overflowed lands made by said State; and where he shall find them to conform to the system of sur-

veys adopted by the United States, he shall construct and approve township plats accordingly, and forward to the general land office for approval: *Provided*, That in segregating large bodies of land, notoriously and obviously swamp and overflowed, it shall not be necessary to subdivide the same, but to run the exterior lines of such body of land. In case such State surveys are found not to be in accordance with the system of United States surveys, and in such other townships as no survey has been made by the United. States, the commissioner shall direct the surveyor general to make segregation surveys, upon application to said surveyor general by the governor of said State, within one year of such application, of all the swamp and overflowed land in such townships, and to report the same to the general land office, representing and describing what land was swamp and overflowed under the grant, according to the best evidence he can obtain. If the authorities of said State shall claim as swamp and overflowed any land not represented as such upon the map or in the returns of the surveyors, the character of such land at the date of the grant, September twenty-eight, eighteen hundred and fifty, and the right to the same, shall be determined by testimony, to be taken before the surveyor general, who shall decide the same, subject to the approval of the commissioner of the general land office." 14 Stat. 219, c. 219, sec. 4.

By this section, rules or methods were established for the identification of swamp and overflowed lands in California which superseded all previous rules or methods for that purpose. It first enacted, that, in all cases where township surveys had been or should thereafter be made under the authority of the United States, and the plats thereof be approved, it should be the duty of the commissioner of the general land office to certify over to the State, as swamp and overflowed, all the lands represented as such upon the approved plats, within one year from the passage of the act, or within one year from the return and approval of such township plats.

The section then provided for the construction of township plats where none previously existed. It required the com-

missioner of the general land office to direct the United
States surveyor general for California to examine the segrega-
tion maps and surveys of the swamp and overflowed lands
made by the State, and directed that when he should find
them to be in conformity with the system of surveys adopted
by the United States he should construct and approve town-
ship plats accordingly and forward them to the general land
office for approval. But in case such surveys should be found
not in accordance with the system of United States surveys,
and in other townships where no survey had been made by
the United States, the commissioner was required to direct the
surveyor general to make segregation surveys, upon application
of the governor of the State, within one year, of all the swamp
and overflowed lands in the township, and report the same to
the general land office, representing and describing what land
was swamp and overflowed according to the best evidence he
could obtain. The section further provided that if the State
should claim as swamp and overflowed any land not so repre-
sented upon such map or in the returns of the surveyors, then
the character of such land at the date of the grant, and the
right of the State thereto, were to be determined by testimony
to be taken before the surveyor general, subject to the approval
of the commissioner of the general land office.

With this brief review of the act of September 28, 1850, and
of the fourth section of the act of July 23, 1866, we proceed
to state what was done by the original defendant, Joseph Kile,
to secure the title of the State. In April, 1864, the United
States subdivisional survey of township 4 north, of range 5
east, of Mt. Diablo meridian, in the county of San Joaquin,
was made, and the field and descriptive notes, together with
the map or plat of the survey, were examined and approved,
and the approval certified by the United States surveyor gen-
eral for California. On the first of July following (1864) a
copy of this examined and approved map or plat was filed in
the United States district land office at Stockton, California,
which district included the lands of that township, and a copy
was returned to the general land office of the United States at
Washington. The certificate of approval by the United States

surveyor of the plat of the survey, written upon its margin, was as follows :

"The above map of township No. 4 north, range No. 5 east, Mount Diablo meridian, is strictly conformable to the field-notes of the survey thereof on file in this office, which have been examined and approved. Surveyor General's Office, San Francisco, California, June 30, 1864.

"L. UPSON, *Surv. Gen. Cal.*"

Upon this approved map or plat the greater part of the lands of the township, including all of section 11, was colored green, and upon the face of the part thus colored the words "swamp and overflowed land" were written. The lands thus colored and marked were excluded from the estimated aggregate area of public lands and included in the estimated aggregate area of swamp and overflowed land.

In August, 1864, Kile made application in accordance with the provisions of the acts of the legislature of California to purchase from the State the southeast quarter of section eleven, as being part of the swamp and overflowed lands granted by the act of Congress; and, on the 18th of that month, the county surveyor of the county of San Joaquin made a survey and recorded in his office a plat and field-notes thereof, and certified and reported the same to the state surveyor general, in whose office they were filed and recorded on the 30th of September following. On that day, and after the state surveyor general had approved the survey, plat and field-notes, the State of California issued and delivered to Kile a certificate of purchase of the southeast quarter of section eleven, founded upon his application and the approved survey. The certificate set forth that Kile had made part payment of the purchase-price and was the purchaser of the land, and that on making full payment and surrendering the certificate he should receive a patent from the State.

On the 5th of August, 1865, Kile, having paid the residue of the purchase-money and surrendered the certificate, received from the State a patent for the land. The patent recites that

all the requirements of the act of Congress, as well as of the acts of the legislature of the State in relation to swamp and overflowed lands, had been complied with, and that the governor, by virtue of the authority vested in him, thereby bargained, sold, and conveyed to Kile the lands with the appurtenances.

These proceedings having been taken, and the patent issued, the first clause of section four of the act of Congress of July 23, 1866, operated to confirm the title of the patentee. That clause, as already stated, provided that in all cases where township surveys had been made, or should afterwards be made, under the authority of the United States and the plats thereof approved, it should be the duty of the commissioner of the general land office to certify over to the State, as swamp and overflowed, all the lands represented as such upon the approved plats, within one year from the passage of the act, or within one year from the return and approval of such township plats. The only objection urged against the operation of this provision is that the township plat was not in terms approved by the commissioner of the general land office. The clause mentioned requires no such approval of township plats which had then been made and approved by the surveyor general of the United States for California. The township surveys were made under the authority of the United States, and the plat thereof was approved by that authority, when they were made and approved by that officer. Only such township plats were to be submitted to the approval of the commissioner as should be subsequently made by that officer from the segregation maps and surveys of swamp and overflowed lands of the State after he had found the surveys to be in conformity with the system of surveys adopted by the United States; and such township plats as should be made by him when the segregation maps and surveys of the State were not in accordance with the United States system of surveys, or were of townships where no surveys at all had been made. Until April 17, 1879, it had not been the practice of the Land Department to require any specific approval by the commissioner, either of surveys of the public lands or of plats of townships in accordance therewith, made by the surveyor general of the

State, before they were deemed so far final as to sanction sales or selections of the lands surveyed and platted. It is true that wherever fraud or error existed in the action of the United States surveyor general for the State, the power of correction was vested in the commissioner, but where the survey was itself correct, and the township plat conformed thereto, they became final and effective when filed in the local land office by that officer.

In speaking of the laws and of the practice of the department on this subject, the late Secretary of the Interior, Mr. Schurz, in a communication to the commissioner of the general land office, under date of August 7, 1877, said:

"By the act of Congress, approved May 1, 1796, (1 Stat. 464,) 'providing for the sale of the lands of the United States in the territory northwest of the river Ohio and above the mouth of the Kentucky River,' the surveyor general was authorized to prepare plats of the townships surveyed, to keep one copy of the same in his office for public information, and to send other copies to the 'places of sale,' and to the Secretary of the Treasury. The present local land offices are equivalent to the 'places of sale' mentioned in the act of 1796, and, as a matter of practice, from that date to the present time the township plats prepared by the surveyor general have been filed by him with the local officers, who thereupon proceeded to dispose of the public lands according to the laws of the United States. There is nothing in the act of 1796, or in the subsequent acts, which requires the approval of the commissioner of the general land office before said survey becomes final and the plats authoritative. Such a theory is not only contrary to the letter and spirit of the various acts providing for the survey of the public lands, but is contrary to the uniform practice of this department. There can be no doubt but that under the act of July 4, 1836, reorganizing the general land office, the commissioner has general supervision over all surveys, and that authority is exercised whenever error or fraud is alleged on the part of the surveyor general. But when the survey is correct, it becomes final and effective when the plat is filed in the local office by that officer."

This view of the secretary was referred to and held to be correct in *Frasher* v. *O'Connor*, 115 U. S. 102, 114. This practice was changed by the Land Department in April, 1879, and communicated in its instructions to surveyors general on the 17th of that month. It was not until after such instructions that the duplicate plats filed in the local land offices were required to be previously approved by the commissioner of the general land office.

There is no finding, nor even any allegation, that the survey and plat of township four, in the county of San Joaquin, were not correct, or that they were disapproved by the Land Department. The only change made upon that plat consisted in an erasure of the designation that some of the lands were swamp and overflowed, and the substitution of a designation of them as public lands, the department having come to a different conclusion from that returned by the surveyor general years before, such conclusion being reached upon an inquiry made long after the department had ceased to have any control over the matter. The notes of the survey and the plat of the township remained precisely as they were when filed in the local land office on the 1st of July, 1864. But if an approval of the township plat by the commissioner of the general land office was necessary, it is to be found in the recognition of its correctness by the subsequent action of the commissioner. In *Wright* v. *Roseberry* there was no approval of the township plat in terms, but it was held to be an approved plat by the fact that it was officially used as such. 121 U. S. 516, 517.

In this case the original and official township plat was prepared by the surveyor general in triplicate; one of which was returned to the general land office of the United States, where it always remained, and one was filed in the local land office at Stockton. It is true that the latter one was afterwards, in 1865, withdrawn by the surveyor general from the local land office by order of the commissioner, and was not returned and filed in that office; but a copy of the plat which had been returned to the general land office, certified by the commissioner, and also by the surveyor general of California, as a

correct copy of the plat on file in that office, was subsequently filed in the local land office at Stockton. It does not appear in terms by whose order this subsequent filing was had, but it must be presumed to have been by direction of the commissioner of the general land office. It is not to be presumed that the parties in charge of the local land office would have allowed a copy of the township plat, which had been taken from its files by order of the commissioner, to be refiled without the authority of that officer. Besides, to that plat thus returned the commissioner referred when he directed the register of the land office at Stockton to make a change of the words "swamp or overflowed lands" written upon it to the words "public lands." And subsequently when a patent of the United States for the land was issued to the plaintiff Tubbs the land was described as embracing eighty acres "according to the official plat of the survey of the same lands returned to the general land office by the surveyor general." The one thus returned was a duplicate of the one originally filed in the local land office.

It is, therefore, conclusively established that such township plat was recognized by the Land Department at Washington as a correct plat, and used as such, which was the only approval of a similar plat in *Wright* v. *Roseberry*. This conclusion is strengthened by the fact that when subsequently the State authorities applied to the commissioner of the general land office to certify over to the State the lands represented upon the plat as swamp and overflowed the application was refused, not on the ground of any supposed error in such plat, but solely for the reason that the Land Department had already divested itself of authority by the issue of a patent to the plaintiff. If there had been any error in the plat which would have justified the action of the department, it would undoubtedly have been stated. When the plaintiff was allowed to make a homestead entry all control over the land had passed from the Land Department, and the title by virtue of proceedings under the state law had been confirmed by the act of Congress of July 23, 1866, and become vested in the defendant. That entry was not made until the 8th of May,

1873, several years after the official map of the township had been filed in the local land office at Stockton and in the general land office at Washington, and the issue of a patent by the State of California to the defendant Kile, and the passage of the act of Congress. Whether the township plat be considered as approved by the action of the surveyor general or by the subsequent recognition of its correctness by the commissioner of the general land office, when approved, the duty of the commissioner to certify over to the State the lands represented thereon as swamp and overflowed was purely ministerial. He could not defeat the title of the State by withholding such certificate, nor could he add to the title by giving it. Its only effect would have been to facilitate the proof of the vesting of the title in the State by its additional recognition of the land as that covered by the congressional grant of 1850. It would not have added to the completeness of the title. A strange thing it would be if the refusal of an officer of the government to discharge a ministerial duty could defeat a title granted by an act of Congress, and enable him to transfer it to parties not within the contemplation of the government. The judgment of the court below must, therefore, be affirmed.

As to the alleged inadvertence in the entry of judgment in favor of the defendant for rents and profits, we have only to say that if there be any such inadvertence, it is not a matter for revision by this court, but only for consideration by the court below.                               *Judgment affirmed.*