[Sac. No. 3119. In Bank.—January 4, 1922.]

## THE SAN JOAQUIN & KINGS RIVER CANAL & IRRIGATION COMPANY, INCORPORATED (a Corporation), Appellant, v. W. H. WORSWICK, Jr., et al., Respondents.

[Sac. No. 3120. In Bank.—January 4, 1922.]

## MILLER & LUX INCORPORATED (a Corporation), et al., Appellants, v. W. H. WORSWICK, Jr., et al., Respondents.

[1] WATERS AND WATER RIGHTS—APPROPRIATIONS—PROTECTION—CONSTRUCTION OF ACTS OF CONGRESS.—Under the act of Congress of July 26, 1866, and the supplemental act of July 9, 1870, providing that wherever by priority of possession rights to the use of water have vested and accrued, and the same are recognized by the local customs, laws, and the decisions of the courts, the possessors and owners thereof shall be maintained and protected therein, the only rights which are confirmed by such enactments are those recognized by the customs, laws, and decisions of the courts in the particular state in which the appropriation is made and in which the land affected lies.

[2] ID.—RIPARIAN RIGHTS — LOWER APPROPRIATOR.—The rights of a riparian owner in the waters of the abutting stream are not affected by any interference with the waters of the stream made on privately owned land after they pass below the boundaries of such riparian land, and such use below, no matter how long continued, or what may be the nature of the claim of right thereto by the user thereof, in no manner affects the riparian rights pertaining to the land above the place of use and point of diversion.

[3] PRESCRIPTION — INVASION OF RIGHT — ESSENTIAL ELEMENT.—In order to establish a right by prescription, the acts by which it is sought to do so must operate as an invasion of the rights of the party against whom it is set up and afford ground for an action.

[4] WATERS AND WATER RIGHTS—LOWER APPROPRIATION—SUPERIORITY OF UPPER RIPARIAN RIGHTS — ACTS OF CONGRESS.—Inasmuch as neither the local customs, laws, and decisions of the California courts had ever recognized or upheld the doctrine that water rights

---

2. Nature of riparian rights and lands to which they attach, notes, 9 Ann. Cas. 1235; Ann. Cas. 1913E, 709; Ann. Cas. 1915C, 1026.

acquired by an appropriation or diversion below on private land would be superior to the riparian rights pertaining to any land above the place of diversion, the conclusion is inevitable that the acts of Congress of 1866 and 1877 neither create such superior rights nor provide for the maintenance or protection thereof.

[5] ID.—DIVERSION UPON PUBLIC LAND — SUBSEQUENT PURCHASE OF UPPER GOVERNMENT LAND — SUPERIORITY OF RIGHTS OF LOWER APPROPRIATOR.—Under the acts of Congress of 1866 and 1870, where a diversion is made on land then belonging to the United States, the right of the appropriator to the water thereby taken is superior to the riparian rights of a subsequent purchaser of land from the United States lying above the point of diversion.

[6] PUBLIC LAND—TITLE OF STATE TO SWAMP AND OVERFLOWED LANDS —IDENTIFICATION AND PATENT SUBSEQUENT TO GRANT—RELATION OF TITLE.—Under the act of Congress of September 28, 1850, granting swamp and overflowed lands to the state, full beneficial enjoyment thereof passed to the state at that time subject only to the contingencies incident to identification, and when the lands were identified and a patent therefor issued to the state on June 10, 1896, the title so transferred related back to the year 1850, and inured to the benefit of the state and its successors in interest for all purposes, as if the legal title had passed at the date of the act.

[7] WATERS AND WATER RIGHTS — APPROPRIATIONS — DIVERSION ON SWAMP AND OVERFLOWED LANDS—SUPERIORITY OF RIGHTS OF SUBSEQUENT UPPER RIPARIAN PURCHASERS.—Where appropriations of water from a river were made in the years 1871 and 1872, and the dams and headgates were situated on tracts of land of the character known as swamp and overflowed lands which were granted by the United States to the state by the act of September 28, 1850, but not patented to the state until June 10, 1896, such appropriations were not superior to the riparian rights of subsequent purchasers of public lands from the United States situated above the place of such diversion, since such swamp and overflowed lands were not at the time of diversion the property of the United States.

[8] ID.—DESERT LAND ACT OF 1877 — APPROPRIATION OF SURPLUS WATER—LIMITATION TO DESERT LANDS.—The Desert Land Act of March 3, 1877, providing that the right to the use of water shall depend upon *bona fide* appropriation and that all surplus water over such actual appropriation and use shall remain free for the appropriation and use of the public for irrigation, mining, and manufacturing purposes, subject to existing rights, applies only to desert lands, and does not apply to all the public lands of the United States, so as to make the rights of appropriators paramount to riparian rights.

[9] ID.—QUIETING TITLE — ESTOPPEL OF UPPER RIPARIAN OWNERS —
BURDEN OF PROOF.—In an action to quiet title to water rights by
appropriators who had been diverting the water by means of
canals and devoting the same to public use for more than forty
years, as against upper riparian owners who had permitted the
water during the entire period to flow by their own lands with-
out any use thereof, the burden was upon the plaintiffs, in sup-
port of their contention that the defendants were estopped, to
prove, if material to the estoppel, that they had knowledge, not
only of the existence of the canals and the diversion of the water
thereby from the river, but also that the same was being devoted
to public use, and evidence of extracts from articles published in
a newspaper referring to the size of the canal and extent of
territory to be irrigated thereby, but not definitely stating the
character of the use, was not sufficient to show such knowledge.

[10] ID.—PUBLIC USE OF WATER BY LOWER APPROPRIATOR—ACQUIES-
CENCE BY UPPER RIPARIAN OWNER — ESTOPPEL.—An upper ri-
parian owner is not estopped from asserting that his title as such
owner is paramount to the right of a lower appropriator, by rea-
son of the fact that he permitted the water to flow by his own
land without use and to be diverted by the appropriator for pub-
lic use, since in order to constitute an estoppel of such a character
the person sought to be estopped must have failed to do some act
which it was within his power to do and the person claiming the
estoppel must have relied on such failure to an extent and for
such a period that the subsequent doing of such act would cause
him injury.

[11] ID.—PUBLIC USE—PRESCRIPTIVE RIGHT—UPPER APPROPRIATOR.—
A person, although not a riparian owner, may acquire a prescriptive
right as against a public use below by taking water out of the
stream above which otherwise would run down to the canals of
the public service corporation.

APPEALS from a judgment of the Superior Court of
Merced County. E. N. Rector, Judge. Affirmed.

The facts are stated in the opinion of the court.

Edward F. Treadwell and Berkeley B. Blake for Appel-
lants.

Snook & Brown, Chas. E. Snook, George M. Naus and
Thos. J. Ledwich for Respondent White & Friant Lumber Co.

R. M. Widney for Respondent John Widney.

Harris & Hayhurst and M. K. Harris for all Respondents,
except John Widney and White & Friant Lumber Co.

SHAW, C. J.—In each of the cases above entitled the plaintiff appeals from the judgment. The two cases were begun separately and separate pleadings, findings, and judgment were filed and made in each case. They were, however, tried together in the court below and the two cases are submitted, so far as the plaintiffs are concerned, upon the same briefs. As the questions are, for the most part, identical, they may be treated together.

In case No. 3119, that of the San Joaquin & Kings River Canal & Irrigation Company Incorporated, the complaint alleges that, under an appropriation and diversion of the waters of the San Joaquin River, made in the year 1871, by the San Joaquin & Kings River Canal & Irrigation Company, the predecessor in interest of the plaintiff, the said company was the owner, from the year 1871 down to the twelfth day of June, 1905, of the right to divert from said river a flow of one thousand cubic feet of water per second; that under a similar appropriation and diversion, made in the year 1897, the said company was the owner, from the last-mentioned year down to the twelfth day of June, 1905, of the right to divert from said river an additional flow of 350 cubic feet per second of the waters thereof; that on the day last mentioned said company sold and transferred to the plaintiff all of its said water rights, together with its canals and works for the diversion and distribution of said water, and that plaintiff has been ever since said transfer, and now is, the owner thereof; that both the plaintiff and its said predecessor were public service corporations and that as such they each, during the time of their respective ownerships thereof, devoted said water to the public use for irrigation of land and other beneficial purposes. It further alleges that during all of this time the defendants were fully aware of the diversion and public use of said water by said plaintiff and its said predecessor, and that the defendants did not object to the same, nor did they, or either of them, divert or use the water of said river until within the last five years preceding the commencement of this action; that during said five years defendants have taken and diverted from the river large quantities of the waters thereof, thereby depriving the plaintiff of the water to which it is entitled as aforesaid, and that the rights of the defendants in said

waters are subject and subordinate to the said rights of plaintiff. The action was begun on October 6, 1913.

The prayer is that plaintiff's title to its said water rights be quieted and that the defendants be enjoined from diverting water so as to interfere therewith.

In case No. 3120, that of Miller & Lux Incorporated and Union Colonization Company, the complaint alleges a diversion from the San Joaquin River of 120 cubic feet of water thereof by the predecessor of said plaintiffs in the year 1872, and the continuous use thereof by said predecessor in interest and by plaintiffs as owners in common as successors, by the continuous distribution thereof for the irrigation of land and other purposes, through a canal known as the Chowchilla canal, and that plaintiffs as such successors are now the owners of the said canal and of the right so acquired in 1872 by the plaintiffs' predecessors in interest to take said quantity of water for the beneficial purposes aforesaid. It further alleges that the plaintiff, Miller & Lux Incorporated, owns a number of parcels of land, fully described, bordering upon the said river and the branches and channels thereof; that the plaintiff Union Colonization Company is also the owner of certain described parcels of land riparian to said river; that the plaintiffs, respectively, have for many years diverted and used the waters of the river and its branches and channels for the irrigation of their said lands, and that other portions of the said lands, by reason of their low elevation, are annually and periodically overflowed and moistened by the waters of said river, and thereby its productiveness is greatly increased; that the riparian right of the said plaintiffs to use the waters of said river and its branches upon their land as aforesaid is subject to the right of the plaintiffs by appropriation to take and use the 120 cubic feet of water per second as above mentioned; that within five years last past the defendants have constructed pumping plants above the head of the said Chowchilla canal and above the lands of plaintiffs above mentioned, and by means thereof have taken large quantities of water from the river so as to prevent plaintiffs from diverting or using the water so appropriated and owned by them as aforesaid and from receiving and using the waters necessary for the irrigation and moistening of their lands riparian to said river as aforesaid; that the rights of

the plaintiffs to said 120 cubic feet of water and to the use of said water on riparian lands are superior to those of the defendants in said stream; that the defendants have no right to the waters of the said river.

The prayer is that plaintiffs be adjudged to be the owners of the right to divert said 120 second-feet of water from said river, and of the right to have said river flow through their said riparian land and to the reasonable use of the waters thereof on said land; that said right to said 120 second-feet be quieted and declared superior to any rights of defendants, and that the riparian rights, if any, of defendants and plaintiffs be ascertained and justly apportioned and defined. This action was begun on April 17, 1914.

In case No. 3119 several of the defendants filed separate answers. Each defendant claimed the right to use the waters of the river as riparian owner of land situated on the river above the points of diversion of the plaintiff.

In case No. 3120 the answers set up the ownership of land riparian to the stream and the right to use the waters thereof as riparian owners, all of said land being situated above the riparian lands of the plaintiffs in said action and above the point of diversion by said plaintiffs of said 120 second-feet of water.

In case No. 3119 the court found that the plaintiff was the owner, subject to certain rights found to be in the defendants, of the right to divert from said river a continuous flow of 1,360 cubic feet of water per second, of which 760 second-feet was held under said appropriation made in 1871 and 600 second-feet was held under the said appropriation made in 1897, mentioned in the complaint; that the defendants, within five years last past, have, by means of pumps, diverted from the river above said plaintiff's dams large quantities of water and thereby the plaintiff has been prevented from diverting and using the amount of water so appropriated and owned by it as aforesaid, and that the said appropriation and use of said water by the plaintiff was notorious, but was unknown to said defendants and that said defendants did not consent thereto.

As to the defendants' rights in said case the court found that certain of the defendants, respectively, owned tracts of land bordering upon said river above the head of said canals of plaintiff, and that as such owners they are entitled to

take and use for the irrigation of said lands a reasonable amount of the waters of said river, and that said riparian rights of the defendants are superior to said rights of the plaintiff.

It further found that of said riparian lands of the defendants, certain parcels, containing in the aggregate nearly 6,000 acres, were a part of the public land of the United States at the time of the appropriation of the 760 second-feet of water in 1871 now owned by the plaintiff, and that at the time of said appropriation other parcels of the defendants' riparian land, aggregating over 500 acres, were not at that time part of the public lands of the United States, but belonged to private owners.

It also found that the headgates and dams of plaintiff's said canals are situated on lands which at the time said first appropriation of 760 feet was made were classed and claimed as swamp and overflowed lands by the state authorities; that applications to purchase the same from the state were made and approved in 1864; that pursuant to said applications the state issued patents to said purchasers; that said lands were listed by the United States to the state of California as swamp and overflowed lands on November 21, 1895, and were patented to the state on January 10, 1896, and that the plaintiff had acquired all the title of the original purchasers from the state to the lands on which its headgates and dams are situated. At the time of the 1897 appropriation, under which plaintiff diverts 600 second-feet of water, all of the lands involved in the action were in private ownership. On March 3, 1877, when the desert land law was enacted by Congress, 2,162 acres of defendants' said riparian lands were public lands of the United States.

With respect to case No. 3120 the court found that the plaintiffs therein were the owners as tenants in common, subject to certain rights of the defendants therein, of the right to divert and use 120 cubic feet flowing per second of the waters of the San Joaquin River, by and through the Chowchilla canal, which right began in the year 1872, the headgates thereof being in part on land entered from the state as swamp and overflowed land by entry approved on March 23, 1861, and patented by the state to the purchaser in 1874, and in part on lands similarly entered from the state by entries approved and patented in 1869; that all of

said land was listed to the state by the United States as swamp and overflowed land in 1895 and patented to the state in 1896 as aforesaid, and that said right of plaintiffs was subject and subordinate to the riparian rights of the defendants therein as found to exist by the court; also that the plaintiffs Miller & Lux Incorporated and Union Colonization Company, respectively, were the owners separately of certain tracts of land riparian to the river, particularly described, as alleged in the complaint, and that the defendants severally have within the last five years pumped out of said river and used on their own land riparian thereto large quantities of water, and thereby have deprived the plaintiffs of the water so appropriated by them through the Chowchilla canal, and have diminished the water available to the said plaintiffs on their said riparian tracts of land.

The riparian lands of the defendants described are the same as those described in the other findings in case No. 3119, so far as they lie above the headgate of the said Chowchilla canal, and the dates when they ceased to be public land are the same as the dates given in the findings in the other case.

The conclusions of law in each case were as follows:

That the rights of the several defendants to take and use water from the San Joaquin River on lands riparian thereto, situated above the plaintiff's points of diversion under their respective appropriations, are paramount to the rights of the plaintiffs under such appropriation, regardless of the times when the uses on the riparian land began, and regardless of the fact that large portions of said riparian land were at the time of the inception of the appropriations part of the public land of the United States; in other words, that the rights of said riparian proprietors to use water from the river on the riparian land are superior to the rights of the plaintiffs under the several appropriations made before the use on the riparian land begun.

The conclusions in each case also involve the proposition, although not expressly stated, that the fact that when the several appropriations under which plaintiff's claims were initiated, the land on which the headgates and dams were located was swamp and overflowed land which had been previously entered from the state as such land and afterward patented by the United States to the state, is not a

material factor in the case, and the question whether such land is or is not to be regarded as land in private ownership from the time of the entry thereof under the state laws as swamp and overflowed land.

The plaintiffs insist that their rights to the water of the river, under the appropriations of 1871 and 1872, are superior to the riparian rights thereto, pertaining to the land of the defendants situated above the dam and headgates of the plaintiffs' canals, with respect to all of said lands that were public lands of the United States or of the state of California at the time the plaintiffs' appropriations were made, respectively.

The question, for the purposes of discussion, should be subdivided into two parts: 1. Where the land on which the diversion works are located is, at the time the diversion is effected, in private ownership, or is held in other ownership than that of the United States; 2. Where the diversion works are made on land then belonging to the United States, as part of its public domain. We will take up these subdivisions in the order stated.

The plaintiffs rely upon the act of Congress of July 26, 1866 (14 U. S. Stats. 253, sec. 9, [9 Fed. Stats. Ann., 2d ed., p. 1349; U. S. Comp. Stats., sec. 4647]), and of July 9, 1870, supplemental thereto (16 U. S. Stats. 218, sec. 17, [9 Fed. Stats. Ann., 2d ed., p. 1360; U. S. Comp. Stats., sec. 4648]), and of the Desert Land Act of March 3, 1877 (19 U. S. Stats. 377, [8 Fed. Stats. Ann., 2d ed., p. 692, etc.; U. S. Comp. Stats., secs. 4674–4678]). Their contention is that these acts have the effect of giving the appropriator of water for the irrigation of land in private ownership, who makes his diversion by means of a dam or headgate also located on land in private ownership, a right paramount to all riparian rights pertaining to public land situated above such place of diversion.

Section 17 of the act of 1870 purports to be amendatory of section 9 of the act of 1866. The appropriations in question were made subsequent to 1870, and, therefore, the two acts may be taken together in order to determine the effect thereof in the present case. So considered they are as follows:

"Wherever by priority of possession rights to the use of water . . . have vested and accrued, and the same are recog-

nized by the local customs, laws, and the decisions of courts, the possessors and owners of such vested rights shall be maintained and protected in the same; and the right of way for the construction of ditches and canals for the purposes herein specified is acknowledged and confirmed'' (sec. 9). ''All patents granted, or pre-emptions or homesteads allowed, shall be subject to any vested and accrued water rights, or rights to ditches and reservoirs used in connection with such water rights, as may have been acquired under or recognized by the aforesaid section 9'' (sec. 17).

[1] Proceeding to an analysis of this language, it will be seen that the only water rights which are protected, maintained, acknowledged, or confirmed by these enactments are those rights which ''are recognized by the local customs, laws, and decisions of the courts.'' This, of course, means in each case the customs, laws, and decisions of the courts in the particular state in which the appropriation is made and in which the land affected lies. Section 17, taken in connection with section 9, must be construed as declaring that lands granted by patents issued by the United States shall be subject to such water rights as had previously vested or accrued under rules which have been established or recognized as law by the decisions of the courts of this state on the subject. [2] It is necessary, therefore, to determine whether or not the decisions of our courts have established the proposition that an appropriation from a stream for use upon lands in private ownership, and made by means of a dam situated upon lands in private ownership, gives to the appropriator a right to the water appropriated which is superior to the right of riparian owners above to the use of water from the stream upon the riparian land. There are no decisions in this state which declare or recognize this doctrine. On the contrary it has always been held that the rights of the riparian owner of such land above are superior to those of the diverter or appropriator below. The law as established and recognized by the decisions of this state, in every case in which it has been considered, is declared to be that the rights of a riparian owner in the waters of the abutting stream are not affected by any interference with the waters of the stream, made on privately owned land after they pass below the boundaries of such riparian land. Such use below, no matter how long

continued or what may be the nature of the claim of right thereto by the user thereof, in no manner affects the riparian rights pertaining to the land above the place of use and point of diversion. Thus in *Hargrave* v. *Cook*, 108 Cal. 77, [30 L. R. A. 390, 41 Pac. 19], the court said: "With any use or diversion of the water after it has passed his land the upper riparian proprietor, having no ownership in and no longer any rights to it, would have no concern. . . . None of his rights would or could be impaired thereby, and without such an impairment he would be without injury, and, consequently, without cause for complaint or redress. His right extends no further than the boundary of his own estate. He cannot complain of the mere facts of the diversion of the watercourse either above or below him, if within the limits of his own property, it is allowed to follow its accustomed channel." And further, speaking of the effect of these facts on the law of prescription, the court proceeds to say: "Before one can acquire a right to the doing of an act in which another so acquiesces, the act itself must amount to an invasion of that other's right, and the doing must either have been so long continued as that a prescriptive claim can be supported upon the theory that the acquiescence presupposes a grant, or under such circumstances as will raise an estoppel against the objecting party. But, as the upper riparian proprietor's right to object to any use or diversion of the water below ceased when it had flowed past his boundary, any such use could not work an invasion of his rights, and he was not called upon to protest against it." The same doctrine has been declared in *Hanson* v. *McCue*, 42 Cal. 310, [10 Am. Rep. 299]; *Bathgate* v. *Irvine*, 126 Cal. 140, [77 Am. St. Rep. 158, 58 Pac. 442]; *Cave* v. *Tyler*, 133 Cal. 567, [65 Pac. 1089]; *Hudson* v. *Dailey*, 156 Cal. 627, [105 Pac. 748]; *Perry* v. *Calkins*, 159 Cal. 177, [113 Pac. 136]; *Miller & Lux* v. *Enterprise etc. Co.*, 169 Cal. 423, [147 Pac. 567]; and *Holmes* v. *Nay*, 186 Cal. 231, [199 Pac. 327].

[3] The proposition is settled by these decisions and it should be adhered to as a rule of property, even if we were doubtful of its soundness in logic, reason, and justice. But we have no such doubt. The rule that such diversions do not affect the upper riparian rights follows logically from the well-settled rule stated in the above-cited cases and in every other case on the subject of prescription, that "in order

to establish a right by prescription, the acts by which it is sought to establish it must operate as an invasion of the rights of the party against whom it is set up. The enjoyment relied upon must be of such a character as to afford ground for an action by the other party." (*Anaheim W. Co.* v. *Semi-Tropic W. Co.*, 64 Cal. 192, [30 Pac. 625].)

The precise question presented in this case was decided in *Cave* v. *Tyler*, above cited. It was there expressly held that a diversion or appropriation of water of a stream, the diversion being on land privately owned and for use on such land, at a point below a tract of government land abutting on the stream only at points above such point of diversion, and the use thereof for five years, gave the appropriator or diverter no rights under the aforesaid acts of Congress as against the riparian rights of a subsequent purchaser from the United States of government land situated upon the stream above the point of diversion. The nature of the water rights intended to be recognized and protected by the said acts of Congress are there clearly described by Justice McFarland. We cannot hope to speak with greater authority on such a subject than this eminent jurist. He was an active practitioner at the bar in the mining regions of California during the period when the rights referred to in said acts became established and "recognized" by the "local customs, laws, and the decisions of the courts." No one could be better advised than he as to those customs, laws, and decisions and the nature of the rights intended to be maintained and protected by the acts aforesaid. [4] Inasmuch as neither the local customs, the local laws, nor the decisions of the California courts had ever recognized or upheld the doctrine that water rights acquired by an appropriation or diversion below on private land would be superior to the riparian rights pertaining to any land above the place of diversion, the conclusion is inevitable that section 9 of the act of 1866 neither creates such superior right nor provides for the maintenance or protection of such rights.

[5] On the second phase of the questions the decisions in this state are to the effect that where the diversion is made on land then belonging to the United States, the right of the appropriator to the water thereby taken is superior to the riparian rights of a subsequent purchaser of land from

the United States lying above the point of diversion. (*South Yuba etc. Co.* v. *Rosa*, 80 Cal. 333, [22 Pac. 222]; *Healy* v. *Woodruff*, 97 Cal. 464, [32 Pac. 528]; *Wood* v. *Etiwanda Water Co.*, 122 Cal. 153, [54 Pac. 726].) The opinions in these cases decide the question but do not state fully the reasons for the conclusion. It is apparent, however, that they must be based on the hypothesis that the reservation provided for by section 17 of the act of 1870 in favor of accrued and vested rights runs to the appropriator of water upon land of the United States and creates in him a right superior to that of the riparian right of the United States pertaining to the land it then owns situated above the place of diversion, so that a subsequent purchaser of such upper lands takes subject to the lower appropriation. We need not go further into the reasons for these decisions, for we are of the opinion that the appropriations under which the plaintiffs claim were not made on land which was at the time thereof the property of the United States in the sense that it must be in order to come within the scope of the two acts of 1866 and 1870. To this question we now address ourselves.

The important facts bearing upon the question last mentioned are as follows: The tracts of land on which the dams and headgates by which said respective appropriations were made are situated are of the character known as swamp and overflowed lands. Said tracts were acquired from the state of California by the respective predecessors in interest of the plaintiffs, under applications to purchase the same as swamp and overflowed lands. These several applications were approved in the years 1861, 1864, and 1869, respectively, and patents therefor were issued by the state to the respective entrymen under said applications in the years 1869 and 1874. Said several tracts were listed and set off by the United States to the state of California as swamp and overflowed lands on November 21, 1895, and in pursuance thereof they were patented to the state with other swamp and overflowed land on June 10, 1896.

The theory of the plaintiff on this point is that the title to these swamp and overflowed lands remained in the United States until they were patented to the state in 1896, that this title was absolute and unqualified, that, therefore, these appropriations were made on public land of the United

States, and, accordingly, that the appropriations of 1871 and 1872 were superior in right to all riparian rights pertaining to any land at that time belonging to the United States situated on the stream above said place of diversion.

The swamp and overflowed lands were granted to the state by the United States by the act of September 28, 1850, [9 Fed. Stats. Ann., 2d ed., pp. 504, etc.; U. S. Comp. Stats., secs. 4958–4960]. By that act it was made the duty of the Secretary of the Interior "to make out an accurate list and plats" of all such lands situated within each state, and, at the request of the Governor thereof, to "cause a patent to be issued to the state therefor." The act declares that "on that patent, the fee simple to said lands shall vest" in such state. It has been decided many times, and upon careful and elaborate consideration, both by the United States supreme court and by this court, that this act operated as a present transfer at that date to each state of all lands within its borders coming within the description of "swamp and overflowed" lands, and that the title of the state thereto did not depend on the actual issuance of a patent to the state therefor by the United States. (*French* v. *Fyan*, 93 U. S. 170, [23 L. Ed. 812, see, also, Rose's U. S. Notes]; *Wright* v. *Roseberry*, 121 U. S. 488, 509, [30 L. Ed. 1039, 7 Sup. Ct. Rep. 985]; *Tubbs* v. *Wilhoit*, 138 U. S. 137, [34 L. Ed. 887, 11 Sup. Ct. Rep. 279]; *Owens* v. *Jackson*, 9 Cal. 322; *Summers* v. *Dickinson*, 9 Cal. 554; *Kernan* v. *Griffith*, 27 Cal. 89; *Tubbs* v. *Wilhoit*, 73 Cal. 63, [14 Pac. 361]; *Foss* v. *Johnstone*, 158 Cal. 119, 130, [110 Pac. 294].)

The decisions in *Michigan etc. Co.* v. *Rust*, 168 U. S. 589, [42 L. Ed. 591, 18 Sup. Ct. Rep. 208], *Brown* v. *Hitchcock*, 173 U. S. 473, [43 L. Ed. 772, 19 Sup. Ct. Rep. 485], *McCormick* v. *Hayes*, 159 U. S. 338, [40 L. Ed. 171, 16 Sup. Ct. Rep. 37], *Chapman* v. *St. Francis Levee Dist.*, 232 U. S. 186, [58 L. Ed. 564, 34 Sup. Ct. Rep. 297], *United States* v. *Chicago etc. Co.*, 218 U. S. 242, [54 L. Ed. 1015, 31 Sup. Ct. Rep. 7], and *Sawyer* v. *Osterhaus*, 212 Fed. 765, do not overrule *French* v. *Fyan* and the other cases first cited, as the plaintiffs contend. On the contrary, it is stated in all of them that the act of 1850 operates as a present grant to the state of the swamp and overflowed lands within the particular state. They merely hold that while the act of 1850 grants the equitable title, it does not carry the legal title, that iden-

tification of the lands as swamp and overflowed lands in the manner specified in the act and the issuance of a patent therefor by the United States to the state is necessary to pass the legal title out of the United States. They further declare that prior to the final identification of the lands as swamp and overflowed lands by the final lists and plats of the Secretary of the Interior, it is within the power of that officer to revise his surveys, lists, and plats, and make corrections therein, under proper proceedings and notice to the particular state, or its successors in interest, and that the identification of the lands cannot be considered as finally settled until this is done and the patent issued in accordance therewith. They all recognize, however, that the beneficial title of the state, under the act, is full and complete, lacking only the identification of the land and the issuance of patent in pursuance thereof, to convert it into a legal title. They also affirm the proposition that the Land Department of the United States has no power arbitrarily to destroy the equitable title so granted to the state, although it has jurisdiction, "after proper notice to the party claiming such equitable title, and upon a hearing, to determine whether or not such title has passed."

[6] It clearly follows, therefore, that the full beneficial enjoyment of the land passed to the state by the act of 1850, and at that time, subject to the contingencies incident to identification and to no others. It would also follow of necessity that when thereafter, as appears here, the land is identified, and a patent therefor issued by the United States, all questions concerning the title of the state or any person claiming under it cease to be of any consequence. The title so finally transferred relates back to the year 1850 and inures to the benefit of the state and its successors in interest for all purposes, as if the legal title to the land finally identified had passed at the date of the act. The acts of 1866 and 1870 could not have been intended to operate for the benefit of appropriations made upon land in which the United States did not then have, and has never since acquired, any beneficial interest.

[7] Our conclusion is that the appropriations of 1871 and 1872, by which the water rights of the plaintiff were acquired, are not, by the aforesaid acts of Congress of 1866 and 1870, made superior or paramount to the riparian

rights pertaining to the public lands of the United States situated on the stream above the place of diversion and afterward purchased by the defendants from the United States.

[8]   The findings show that some 2,242 acres of land belonging to the defendants and upon which they are using water from the river were purchased by them, respectively, from the United States after the passage of the act of March 3, 1877, known as the Desert Land Act.   It is contended by the plaintiffs that, with respect to the waters used by these defendants on said lands under claim that they had a right to do so as riparian owners, the rights of the plaintiffs under their said appropriations are made paramount to such riparian rights by the provisions of the said Desert Land Act. (19 U. S. Stats. 377, [8 Fed. Stats. Ann., 2d ed., p. 692; U. S. Comp. Stats., sec. 4674].)

The title of this act is, ''An act to provide for the sale of desert lands in certain States and Territories.''   It provides for the sale of desert lands in amounts not exceeding one section to any qualified person who declares on oath that he intends to reclaim such desert land by conducting water upon the same within three years thereafter.   Then follows a proviso as follows: ''Provided however that the right to the use of water by the person conducting the same, on or to any tract of desert land of six hundred and forty acres, shall depend upon *bona fide* prior appropriation: and such right shall not exceed the amount of water actually appropriated, and necessarily used for the purpose of irrigation and reclamation: and all surplus water over and above such actual appropriation and use, together with the water of all lakes, rivers and other sources of water supply upon the public lands and not navigable, *shall remain and be held free for the appropriation and use of the public for irrigation, mining and manufacturing purposes subject to existing rights.*''   (Sec. 1.)   Section 2 of the act provides: ''That all lands exclusive of timber lands and mineral lands which will not, without irrigation, produce some agricultural crop, shall be deemed desert lands, within the meaning of this act.''   Section 3 provides further that ''the determination of what may be considered desert land shall be subject to the decision and regulation of the Commissioner of the General Land Office.''

The theory of the plaintiffs is that this act operates as a separation of the riparian rights pertaining to all lands of the United States from the land itself and a dedication of the waters covered by such riparian rights to public use for irrigation, mining, and manufacturing purposes, and that in consequence of this dedication the riparian rights pertaining to the land acquired from the United States by the defendants after the passage of said act are subject and subordinate to the rights of the plaintiffs to take the water so appropriated by them and devote the same to public use as they have been and are doing. In support of this proposition the plaintiffs rely on the decision of the supreme court of Oregon in *Hough* v. *Porter,* 51 Or. 318, [95 Pac. 732, 98 Pac. 1083]. The court in that case, in a very elaborate opinion, reached the conclusion that the last clause of section 1 above quoted applied to all lands of the United States and was a dedication of the waters thereon to public use subject to existing rights. The supreme court of Washington, however, in *Still* v. *Palouse etc. Co.,* 64 Wash. 606, [117 Pac. 466], and in *Bermot* v. *Morrison,* 81 Wash. 538, [Ann. Cas. 1916D, 290, 143 Pac. 111], reached precisely the opposite conclusion. In the first-mentioned Washington case the court said: "The act itself manifestly relates only to the reclamation of desert lands and confines the use of the water to the amount 'actually appropriated and necessarily used for the purpose of irrigation and reclamation,' such right to be determined by *bona fide* prior appropriation. As to such lands, Congress recognized and assented to the appropriation of water in contravention of the common-law right of the lower riparian owner to insist on the continuous flow of the stream," and it proceeded to hold that as none of the persons making this claim had settled upon or obtained the land as desert lands under the act of 1877, no rights under said act were attached to such lands. This decision was followed in the subsequent case. We think the conclusion of the Washington supreme court was correct. It is obvious from the framework and language of the act of 1877 that it was not intended to apply to all the public lands of the United States. Its main purpose was to provide for the sale of desert lands which could be reclaimed by bringing water thereon. It may be true that as to such lands the purpose was to divert the riparian rights in the waters ex-

isting thereon and devote the same to the public uses stated. We do not think that question is involved in the present case and we need not express any opinion on it. There is nothing in the act which justifies giving that particular part thereof so wide an application as to embrace all lands of the United States, wherever situated. The plaintiffs do not claim that any of the land belonging to the defendants was purchased or acquired under the Desert Land Act, and there is no finding that in fact such lands were desert lands. The act itself commits the determination of the question what may be considered desert lands to the commissioner of the general land office. It is not claimed that he has made any determination of the fact with respect to any tract of land in controversy in this action. It was for the plaintiffs to show this fact, if it were material to their case, and as they have not done so we must presume that no such determination was ever made. It follows from what we have said that the rights of the plaintiffs under their appropriations are not affected by the provisions of the Desert Land Act.

[9] Another contention of the plaintiffs is that the defendants are estopped to assert that their title as riparian owners is paramount to the rights of the plaintiffs under their appropriations below. They claim the estoppel on the ground that the plaintiffs have been diverting the water by means of its canals and under its appropriation and devoting the same to public use for irrigation and other purposes for more than forty years, and that the defendants did, during all of that period, permit the water of the stream to flow by their own lands without any use thereof and to pass on down to the plaintiffs' headgate, there to be taken out and appropriated to the public use, without protest, objection, or notice of their respective claims. In support of this estoppel they invoke the rule set forth in the decisions of this court in cases where a railroad company or canal company serving a public use has taken the land of another for such railroad or canal and has operated the same without objection by the owner and without compensating him therefor. In these cases it is held that the owner of the property, after having permitted such public use to begin and continue until public rights have accrued therein, cannot enjoin the operation of the railroad or canal, and that his only remedy is an action for damages for the taking of his property for

public use. (*Fresno etc. Co.* v. *Southern Pac. etc. Co.,* 135 Cal. 207, [67 Pac. 773]; *Southern California Co.* v. *Slauson,* 138 Cal. 344, [94 Am. St. Rep. 58, 71 Pac. 352]; *Gurnsey* v. *Northern C. P. Co.,* 160 Cal. 709, [36 L. R. A. (N. S.) 185, 117 Pac. 906]; *Katz* v. *Walkinshaw,* 141 Cal. 136, [99 Am. St. Rep. 35, 64 L. R. A. 236, 70 Pac. 663, 74 Pac. 766]; *Crescent Canal Co.* v. *Montgomery,* 143 Cal. 248, [65 L. R. A. 940, 76 Pac. 1032]; *Newport* v. *Temescal Water Co.,* 149 Cal. 538, [6 L. R. A. (N. S.) 1098, 87 Pac. 372]; *Barton* v. *Riverside Water Co.,* 155 Cal. 515, [23 L. R. A. (N. S.) 331, 101 Pac. 790].)

The finding of the court is "that the taking, appropriation, *and use* of said water by plaintiffs was notorious, but was unknown to the said defendants, and the said defendants did not acquiesce in or assent thereto." (Italics ours.) It is contended that this finding is contrary to the evidence. It devolved upon the plaintiffs, in support of their estoppel, if the fact was material to such estoppel, to prove that the defendants had knowledge not only of the existence of the canals and the diversion of the water thereby from the river, but also that the same was being devoted to public use. The only evidence on the subject consisted of a number of extracts from articles published in California newspapers in the years from 1871 to 1878, inclusive. The nearest newspaper to the location of the lands of the defendants was the "Fresno Expositor," which published one article on the subject in 1873. The articles referred to the size of the canal, the extent of territory to be irrigated thereby, but did not definitely state whether the use to which the water was to be applied was a public or private use. No evidence is called to our attention showing actual knowledge on the part of any one of the defendants that the plaintiffs, or either of them, were engaged in supplying water for public uses, or that either of them had ever seen any of the publications introduced in evidence. The fact that the taking and use of the water was notorious, as found by the court, was not proof of knowledge by defendants, but was merely a circumstance from which, with other circumstances, the court might or might not have inferred such knowledge. Its finding shows that it did not infer knowledge. We do not think the finding was contrary to the evidence. In our consideration of the case, therefore, it must be assumed that none

of the defendants had knowledge of the public use to which the water was devoted. We do not mean to say that such knowledge was material, however.

The question presented by the plaintiffs in regard to such estoppel has never been decided by this court. In *Miller & Lux* v. *Enterprise etc. Co.,* 169 Cal. 423–430, [147 Pac. 579], the court discussed the question at length and set forth the various decisions on the subject and the reasons which support the doctrine which the plaintiffs invoked. After so doing, however, the court declined to decide the question. After extensive quotations from the decisions holding that injunction would not be granted in the cases stated, the court said: "It is to be observed that in all of the above cases the public use involved an interference with the property rights of a private owner, sufficient to give such owner an immediate right of action to abate or prevent the same. . . . This right in the owner to enjoin the public use before it had become established, appears to have constituted an important factor in the statement of the doctrine." (Page 430.) This case, it may be observed, involved the same canal and the same appropriation that is involved in S. F. No. 3119, now under consideration.

[10] From what we have already said it is clear that the upper riparian owners could not have maintained any action or proceeding to prevent the appropriation of the water from the stream by plaintiffs after it had passed below defendants' lands. It is difficult to see how they could be estopped by the taking of the water below and its dedication to a public use when they could by no means within their power prevent or restrain the same. In order to constitute an estoppel of this character the person sought to be estopped must have failed to do some act which it was within his power to do and the person claiming the estoppel must have relied on such failure to such an extent and for such a period that the subsequent doing of such act would cause him injury. In the present case the act which it is now claimed the defendants should have done was not within their power. They could not have prevented the appropriations by the plaintiffs. We may add that since the courts had many times decided that a diversion below his land did not concern or injure the riparian owner above, and they had each presumably rested secure in this rule, which had become a

rule of property, it would not be consonant with justice to say to such proprietor that he has lost those rights through no fault or failure of his own, but simply because he has not seen fit to use the waters upon his riparian land, and that to do so would be equivalent to this court erecting a statute of limitations against an upper riparian proprietor, and in the same breath decreeing that it had barred all his rights. For these reasons we are of the opinion that no estoppel is created against the defendants to now claim their riparian rights, although the same may cause injury to the plaintiffs' appropriation by consuming part of the water of the stream before it reaches the plaintiffs' place of diversion.

[11] It appears that the court found that certain of the defendants had obtained by prescription a right to divert from the stream at points above the plaintiffs' places of diversion some 13 75/100 second-feet of water, which they had applied to the irrigation of some thirty-one acres of nonriparian land and 759 acres of riparian land. They claim that this finding is not sustained by the evidence nor by the law. We know of no rule of law that would prevent a person who owned land riparian to the stream above the place of diversion of water therefrom by some other person, even by a public service corporation for public use, from taking water from the stream and acquiring title thereto by prescription as against such public use. A public service corporation is no more exempt from this deprivation than any other owner of a water right. Nor are we aware of any rule of law that any person, although not a riparian owner, may not acquire a prescriptive right as against a public use below by taking water out of the stream above which otherwise would run down to the canals of the public service corporation. It is not claimed that the evidence does not show that the taking and use of the water was adverse, under claim of right, and continuous for a period of five years before the action was begun. Such being the case there is no merit in the claim that the finding is not sustained by the evidence. Furthermore, with respect to the use on the riparian lands, inasmuch as the owners had the right to use the same without asking leave of the plaintiffs, the finding that they acquired the right by prescription is immaterial. With respect to the finding as to defendants' rights by prescription, the plaintiffs complain that the pleadings did not aver

such right and that, therefore, such finding was improper. This objection affects only the right adjudged to defendant White & Friant Lumber Company to take about one and one-fourth second-feet of water for irrigation on thirty-one acres of nonriparian land. The pleading was lacking in certainty as to the quantity claimed and taken. But there was no demurrer for uncertainty and no objection to any evidence on the subject. Under all these circumstances, the lack of sufficient averment should be deemed to have been waived at the trial.

As to the claim that the diversions above did not, so far as appears, diminish the stream flowing at their dams to such an extent as to deprive plaintiffs of the quantity of water they had appropriated, it is sufficient to refer to *Horst v. Tarr M. Co.,* 174 Cal. 436, [163 Pac. 492], and to say that the complainants herein are based on the allegation and theory that the diversions by defendants did deprive plaintiffs of water to which they were entitled.

No other points worthy of mention are presented in support of these appeals.

In each of the cases mentioned herein the judgment is affirmed.

Lennon, J., Shurtleff, J., Sloane, J., Wilbur, J., and Waste, J., concurred.

Rehearing denied.

All the Justices concurred.